**MINNESOTA CITIZENS CONCERNED FOR LIFE, INC., et al., Plaintiffs,**

v.

**Douglas A. KELLEY, et al., Defendants.**

No. Civ. 02–3819(RHK/AJB).

United States District Court, D. Minnesota.

Nov. 12, 2003.

James Bopp Jr. and Jeffrey P. Gallant, Bopp, Coleson & Bostrom, Terre Haute, Indiana; Scott M. Lucas, Olson & Associates, Edina, Minnesota, for Plaintiffs.

Attorney General Mike Hatch, Chief Deputy Attorney General Kristine L. Eiden, and Assistant Attorneys General Hilary Lindell Caliguri, and Jennifer A. Service, Office of the Minnesota Attorney General, St. Paul, Minnesota, for Defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

This matter comes before the Court on cross motions for summary judgment. Plaintiffs Minnesota Citizens Concerned for Life, Inc. ("MCCL"), David Racer, and the Committee for State Pro–Life Candidates ("CSPC") (collectively, "Plaintiffs"), have sued Defendants Douglas A. Kelley, Clyde Miller, Wil Fluegel, Sidney Pauly, Terri Ashmore, and Robert Milbert, in their capacities as Chair and members of the Campaign Finance and Disclosure Board, and Amy Klobuchar, in her official capacity as County Attorney for Hennepin County, Minnesota[1] (collectively, "Defen-

1. Klobuchar was originally sued in her official capacity and as a representative of the putative class of County Attorneys in the State of Minnesota. Plaintiffs have not, however, moved for class certification.

dants"), alleging that various provisions of Minnesota's election laws violate Plaintiffs' speech and association rights under the First Amendment of the United States Constitution. Plaintiffs and Defendants have now each moved for summary judgment. For the reasons set forth below, the Court will grant each motion in part, and deny in part.

## Background

### I. Campaign Finance Reform in Minnesota

In oral argument, both sides agreed that Minnesota is generally considered to be a "clean" state with regard to political corruption. Minnesota statutes regulating campaign finance include laws–such as one challenged here–dating back as far as 1912. *See* Minn.Stat. § 211B.06. For decades prior to Watergate, Minnesota had campaign reporting requirements and spending limits. (*See* Peter S. Wattson, "Minnesota's Campaign Finance Law," *available at,* http://www.senate.leg.state.mn.us/departments/ scr/treatise/campfin .htm); *see also* Fed.R.Evid. 201(b). In 1974, in response to Watergate, the legislature enacted an ethics in government law, imposing new contribution limits, partial public financing of elections, expenditure limits,[2] and tax credits for political contributions.[3] (*Id.*)

In the early 1990's, a wave of scandals prompted the legislature to dramatically revise the State's campaign finance laws. (*See* Schultz Aff. ¶5.) Common Cause Minnesota, a non-partisan organization dedicated to reform at all levels of government, assembled a campaign finance reform task force comprised of legislators from both parties, lobbyists, and representatives of the Minnesota League of Women Voters, the Joint Religious Legislative Coalition, and the Citizens League. (*See* Higinbotham Aff. ¶2.) During the 1993 legislative session, the task force presented its recommendations to the legislature. (*Id.* ¶3.) MCCL lobbied against these recommendations. (Duffy Aff. ¶3.) In the end, the legislature enacted a number of the task force's proposed reforms, including several challenged in this litigation: a ban on the transfer of funds between candidates, lower contribution limits, and an aggregate cap on special-interest contributions.[4] (*See* Higinbotham Aff. ¶3.)

### II. The Parties

#### A. Plaintiffs

Plaintiff MCCL is a nonprofit, contributor-funded organization incorporated under the laws of the State of Minnesota. (Am. Verified Compl. ¶14.) According to its Articles of Incorporation, MCCL's purposes include "inform[ing] the public on abortion and related subjects." (*Id.* Ex. C at 1.) MCCL communicates with the general public through press conferences, radio spots, newspaper editorials, newsletters, and its website. (*Id.* ¶36.)

Plaintiff CSPC is a registered political committee affiliated with MCCL that produces communications expressly advocating the election or defeat of a clearly identified candidate. (*Id.* ¶43.) In addition to

---

2. The expenditure limits were struck down in *Bang v. Chase,* 442 F.Supp. 758 (D.Minn. 1977).

3. In 1991, the tax credit became a refund. Thus, under Minnesota law, donors may now give up to $50 to a state political candidate or party and receive a full refund from the State, provided the candidate has agreed to certain limits on expenditures.

4. It also included limits on independent expenditures, which were challenged by MCCL, among others, and struck down as unconstitutional. *See Day v. Holahan,* 34 F.3d 1356 (8th Cir.1994); *see also Republican Party of Minnesota v. Pauly,* 63 F.Supp.2d 1008 (D.Minn.1999) (Montgomery, J.).

such activities, CSPC sometimes makes contributions to candidates' personal campaign committees. (*Id.* ¶ 44.)

Plaintiff David Racer was an unsuccessful candidate for the Minnesota Senate from District 67 in a November 2002 special election held following redistricting. (*Id.* ¶ 47.) He plans to run for office in Minnesota again. (*Id.* ¶ 16.)

## B. Defendants

Defendants Douglas A. Kelley, Wil Fluege, Clyde Miller, Sidney Pauly, Terri Ashmore, and Robert Milbert are members of the Minnesota Campaign Finance and Disclosure Board ("the Board"). Established in 1974 by statute and charged with administration of the Ethics in Government Act, the Board's members are appointed by the Governor for staggered four-year terms. *See generally* Minn.Stat. § 10A.02. The appointments must be bipartisan and confirmed by the Minnesota House and Senate by a three-fifths margin. *Id.*

Defendant Amy Klobuchar is the County Attorney for Hennepin County, Minnesota. (Am. Verified Compl. ¶ 18.) She has been sued in her official capacity as a county attorney responsible for enforcing Minnesota's election laws. (*Id.*)

## III. Procedural History

On October 4, 2002, approximately one month prior to election day, Plaintiffs filed suit in this Court seeking to preliminarily enjoin the enforcement of several major provisions in Minnesota's larger scheme for regulating campaign finance and elections. (*See* Am. Verified Compl.) The Court found that Plaintiffs' Verified Complaint for Declaratory and Injunctive Relief, which was 57 pages in length and contained 219 separately numbered paragraphs, failed to comply with the "short and plain" requirement of Federal Rule of Civil Procedure 8(a)(2). (*See Minnesota*

*Citizens Concerned for Life*, Civ. No. 02–3819 (RHK/AJB), slip op. at 1 (D.Minn. Oct. 16, 2002) (Kyle, J.).) Likewise, the Court found that Plaintiffs' 85–page Memorandum in Support of the Motion for Preliminary Injunction failed to comply with the 35–page limitation of Local Rule 7.1(c) and that Plaintiffs' Motion to Exceed Page Limit did not show good cause for exceeding those page limits. (*Id.*)

Following the 2002 election, Plaintiffs filed an *Amended* Verified Complaint in accord with the Court's Order of October 16, 2002. On February 3, 2003, Plaintiffs filed a Motion for Preliminary Injunction. After lengthy briefing, Plaintiffs moved on June 6, 2003 to convert their Motion for a Preliminary Injunction into a Motion for Summary Judgment, which the Court granted. Defendants filed their own Motion for Summary Judgment on June 13, 2003.

## Standard of Decision

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). It is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court views the evidence, as well as all reasonable inferences, in a light most favorable to the nonmoving party. *See Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996); *see Adkison v. G.D. Searle & Co.*, 971 F.2d 132, 134 (8th Cir.1992). The moving party carries the burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 224 F.3d 735, 738 (8th Cir.2000). The nonmoving

party may not rest upon the allegations or denials of its pleadings. Rather, the non-movant must establish the existence of specific facts that create a genuine issue for trial. Neither mere allegations nor denials are sufficient. *See Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. 2505. On summary judgment, the court does not weigh facts or determine the credibility of affidavits and other evidence. *See id.* at 249, 106 S.Ct. 2505. The nonmovant cannot, however, avoid summary judgment by highlighting some alleged factual dispute between the parties. Instead, the disputed fact must be "outcome determinative under prevailing law"; it must be material to an essential element of the specific theory of recovery at issue. *See Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir.1992). In essence, the court determines whether there is a need for a trial. *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505.

### Analysis

The Minnesota Ethics in Government Act, Minn.Stat. § 10A.01 *et seq.,* regulates campaign financing for all candidates seeking statewide office. Elections and fair campaign practices are governed under Minn.Stat. §§ 204.B through 211B.205. Plaintiffs challenge a number of discrete provisions in Minnesota's larger scheme for regulating elections, including: (1) the inter-candidate transfer ban of Minn.Stat. § 10A.27, subd. 9; (2) year-based contribution limits as set forth in Minn.Stat. § 10A.27, subd. 1; (3) the aggregate limit on special interest contributions of Minn.Stat. § 10A, subd. 11; (4) the restriction on the charitable solicitation of candidates as set forth in Minn.Stat. § 211B.08; (5) the lobbyist disclosure requirements of Minn.Stat. § 10A.04; (6) the definition of "campaign material" of Minn.Stat. § 211B.01, subd. 2, and the campaign material disclaimer requirement of Minn.Stat. § 211B.04; and (7) the definitions of "political committee" and "political fund" as pro-

vided in Minn.Stat. § 10A.01. The Court will address each of these provisions in turn.

### I. Minnesota Campaign Finance Reform Act of 1993

Plaintiffs challenge three key provisions of the Minnesota Campaign Finance Reform Act of 1993:(1) the inter-candidate transfer ban of Minn.Stat. § 10A.27, subd. 9; (2) year-based contribution limits as set forth in Minn.Stat. § 10A.27, subd. 1; and (3) the aggregate limit on special interest contributions of Minn.Stat. § 10A, subd. 11.

### A. Inter–Candidate Transfer Ban

The inter-candidate transfer ban of Minn.Stat. § 10A.27, subd. 9 prohibits candidates from accepting donations from other candidate's political committees, except in limited circumstances. Minn.Stat. § 10A.27, subd. 9 states:

> A candidate or the treasurer of a candidate's principal campaign committee shall not accept a transfer or contribution from another candidate's principal campaign committee or from any other committee bearing the contributing candidate's name or title or otherwise authorized by the contributing candidate, unless the contributing candidate's principal campaign committee is being dissolved. A candidate's principal campaign committee shall not make a transfer or contribution to another candidate's principal campaign committee except when the contributing committee is being dissolved.

Minn.Stat. § 10A.27, subd. 9. According to Defendants' Affidavits, the inter-candidate transfer ban was designed to "make[ ] sure that contributions are used by the candidate intended by the contributor, reduce[ ] the concentration of power among a few incumbents, and prevent[ ] the laundering

of contributions through other campaign committees...." (Duffy Aff. ¶ 6.)

Plaintiff David Racer claims that the inter-candidate ban violates his First Amendment right to associate himself with candidates sharing similar views.[5] Defendants counter that (1) Racer does not have standing and his claim is not ripe, and (2) the provision passes constitutional muster.

## 1. Justiciability

■ Article III of the Constitution requires the federal courts to adjudicate only "actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). This "bedrock requirement," *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), gives rise to the related doctrines of standing, mootness, and ripeness, which state "fundamental limits on federal judicial power in our system of government." *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *see also Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir.1996).

Defendants argue that Racer fails the standing and ripeness requirements because the 2002 election is over and there is no certainty that he will ever run for office again. Although Defendants avoid labeling it as such, they essentially pose a mootness question: Can Racer bring his claim after the election in which he was a candidate has passed, with only conclusory statements supporting his claim that he plans to run again? The Court finds that he can.

■ Challenges to the validity of statutory provisions governing future elections are routinely saved by the "capable of repetition yet evading review" exception to the mootness doctrine. *See Tobin for Governor v. Illinois State Bd. of Elect.*, 268 F.3d 517, 528–29 (7th Cir.2001). Using the preeminent example of this exception–challenges to abortion laws–the Seventh Circuit has held that

> [a] candidate plaintiff no more has a duty to run in every election in order to keep his suit alive than an abortion plaintiff has a duty to become pregnant again at the earliest possible opportunity to keep her suit alive.

*Majors v. Abell*, 317 F.3d 719 (7th Cir. 2003) (Posner, J.). Thus, courts are generally unwilling to "interrogat[e] ... plaintiff[s] to assess the likely trajectory of [their] political career[s]." *Id.*

Here, Racer was a candidate for election in 2002, and has indicated an interest in running again. In the context of a First Amendment, pre-enforcement challenge, justiciability demands little more than that. The Court therefore concludes that Racer has standing to contest the inter-candidate transfer ban.

## 2. Substantive Challenge

■ Racer asserts that the inter-candidate transfer ban violates his right to receive money from candidates with like views. A limit or ban on campaign contributions "involving significant interference with associational rights passes muster if it ... [is] closely drawn to match a sufficiently important interest." *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 386–88, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) (internal quotations omitted). Restrictions on campaign contributions are "subject to relatively marginal review under the First Amendment,

---

**5.** Racer asserts that Tom Neuville, a candidate for the Minnesota Senate, wished to acknowledge his substantial agreement with Racer by contributing to Racer's campaign with funds from his principal campaign committee. (*See* Am. Verified Compl. Ex. S. ¶¶ 3–4.)

because contributions lie closer to the edges than to the core of political expression." *Federal Election Comm'n v. Beaumont,* —— U.S. ——, ——, 123 S.Ct. 2200, 2210, 156 L.Ed.2d 179 (2003).[6] Minn.Stat. § 10A.27, subd. 9, meets this standard.

The inter-candidate transfer ban is designed to avoid the appearance of corruption. Thwarting the appearance of corruption by combating the "circumvent[ion] of contribution and coordinated spending limits binding on other political players" qualifies as a sufficiently important governmental interest. *Federal Election Comm'n v. Colorado Republican Fed. Campaign Comm.,* 533 U.S. 431, 456, 456 n. 18, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001). Prior to the passage of the transfer ban, "[c]ontributions between candidates sometimes resemble[d] a revolving door" where legislators–even those running unopposed–often "accepted thousands of dollars in taxpayer-provided public financing while making substantial contributions to other candidates." (Schultz Aff. Ex. 8 (Jack B. Coffman and Thomas J. Collins, "The Bucks Stop, But Where?" St. Paul Pioneer Press, April 14, 1992, at 1A).) For instance, in the 1990 election, candidates transferred more than $760,000 of their contributions to other campaigns. (Olson Aff. Ex. B (Citizens League Report, *Reform the Election Process, Restore the Public Trust* (1992) at 17).) Such transfers "can leave voters wondering if the recipients are beholden to the legislator who made the transfer." (*Id.*) More pressingly, "these transfers between one campaign committee and another" function in practice as "a way of circumventing spending limits...." (Caligiuri Aff. Ex. B) (Floor Debate on H.F. 2666, March 29, 1990 (comments of Rep. Gil Gutknecht).) Given "the long-recognized rationale of combating circumvention of contribution [and coordinated spending] limits," *Colorado Republican,* 533 U.S. at 456 n. 18, 121 S.Ct. 2351, the inter-candidate transfer ban is designed to meet this interest so as to avoid the appearance of corruption.

The inter-candidate transfer ban addresses this interest closely. Here, both sides largely agree on the most important aspect of the ban: It prohibits donations from candidates' campaign committees, but it does *not* prohibit donations from the candidates themselves.[7] While Plaintiffs raise the specter of candidates effectively unable to contribute to the campaigns of their like-minded colleagues, this is entirely baseless. Candidates *may* contribute to the campaigns of their fellow candidates, subject to the same rules that apply to each and every other individual. Accordingly, the Court finds that the inter-candidate transfer ban is closely drawn and passes muster under the First Amendment.

## B. Year–Based Contribution Limits

■ Racer also contends that Minn. Stat. § 10A.27, subd. 1, which establishes year-based contribution limits, violates the First Amendment by discriminating

---

**6.** Although the parties' papers present a dispute over the appropriate level of scrutiny, the Supreme Court's recent decision in *Beaumont,* 123 S.Ct. at 2210, resolves the question in favor of this lesser standard.

**7.** Lawyers being lawyers, of course, both sides keep their options open. While halfheartedly arguing in a footnote that subsection 9 *could* be read to prohibit individual candidate donations–the Court finds nothing in the plain language of the statute to support such a reading–Plaintiffs tacitly acknowledge this Court's obligation to construe statutes so as to avoid constitutional problems. Similarly, Defendants initially labeled subsection 9 as an "inter-candidate transfer *restriction,*" rather than "ban." Following the release, however, of *Beaumont,* Defendants were feeling their oats and began referring to it as a "ban" in their subsequent papers.

against challengers. Minn. Stat § 10A.27, subd. 1 provides, in pertinent part:

[A] candidate [for state senator] must not permit the candidate's principal campaign committee to accept aggregate contributions made or delivered by any individual, political committee, or political fund in excess of ... $500 in an election year for the office sought and $100 in the other years....

Minn.Stat. § 10A.27, subd. 1(d).

While the constitutional guarantee of the First Amendment generally "has its fullest and most urgent application precisely to the conduct of campaigns for political office," *Buckley v. Valeo*, 424 U.S. 1, 16, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court has been careful to distinguish between limits on expenditures and limits on contributions:

[A] limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated symbolic act of contributing. At most the size of the contribution provides a rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or a campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.

*Id.* at 20–21, 96 S.Ct. 612. Thus, the Supreme Court has concluded that "limiting contributions le[aves] communication significantly unimpaired." *Shrink Missouri*, 528 U.S. at 386, 120 S.Ct. 897.

◼ Here, Racer argues that the year-based limit on contributions discriminates against challengers because they generally enter a race late in an election cycle, while incumbents are able to raise money throughout their terms. While "permitting incumbents to insulate themselves from effective electoral challenge" might be among the host of "constitutional evils" forbidden by the First Amendment, *id.* at 402, 120 S.Ct. 897 (Breyer, J., concurring), Racer has not provided *evidence* that such a scheme is at work here. Rather, he simply quotes from the Ninth Circuit's review of the District of California's factual findings regarding a California ballot proposition. In oral argument, counsel for Plaintiffs indicated that the Court could use its common sense to find that the year-based limit discriminates as a matter of law. The Supreme Court, however, has cautioned that "[a]bsent *record evidence* of invidious discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions." *Buckley*, 424 U.S. at 31, 96 S.Ct. 612 (emphasis added). Racer has provided no such evidence here.

Accordingly, the Court has no basis on which it could find that the year-based limit discriminates against challengers as a class. The Court therefore finds that Racer has failed to carry his burden as to the year-based contribution limits. *See Jirau–Bernal v. Agrait*, 37 F.3d 1, 2 (1st Cir. 1994) ("A plaintiff asserting a political discrimination claim under the First Amendment bears the preliminary burden of producing competent direct or circumstantial evidence....").

## C. Aggregate Special Interest Limit

■ Minn.Stat. § 10A.27, subd. 11, caps the aggregate amount of contributions that a candidate may receive from political action committees ("PAC"). CSPC alleges that this aggregate limit effectively bans PAC donations once candidates reach the aggregate threshold. The aggregate limit states, in pertinent part:

> A candidate must not permit the candidate's principal campaign committee to accept a contribution from a political committee, political fund, lobbyist, or large contributor, if the contribution will cause the aggregate contributions from those types of contributors to exceed an amount equal to 20 percent of the expenditure limits for the office sought by the candidate, provided that the 20 percent limit must be rounded to the nearest $100.[8]

Minn.Stat. § 10A.27, subd. 11. Defendants assert that the aggregate limit is designed to thwart corruption and the appearance of corruption by preventing PACs and other special interests from exerting undue influence over the election process.

■ A contribution regulation may significantly interfere with associational rights so long as "the Government demonstrate[s] that contribution regulation [is] 'closely drawn' to match a 'sufficiently important interest.'" *Shrink Missouri*, 528 U.S. at 387–88, 120 S.Ct. 897 (quoting *Buckley*, 424 U.S. at 25, 96 S.Ct. 612). This "relatively complaisant review" is appropriate because, as stated above, "contributions lie closer to the edges than to the core of political expression." *Beaumont*, 123 S.Ct. at 2210.

As with the inter-candidate transfer ban, the aggregate special interest cap addresses the compelling government interest of preventing "corruption and the appearance of corruption." *Shrink Missouri*, 528 U.S. at 390, 120 S.Ct. 897 (internal quotations omitted). "If the record demonstrates that the danger of corruption, or the appearance of such a danger, is greater when dealing with PAC money as opposed to other contributions, then the state's justification is constitutionally sufficient." *Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1096 (9th Cir.2003); *see also Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 658–60, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) (prevention of corruption justification sufficient to justify differential treatment of corporations).

Here, Defendants have provided evidence sufficient to justify the differential treatment of CSPC and other PACs. Defendants' unrebutted exhibits demonstrate that, prior to the enactment of aggregate special-interest cap, Minnesota elections "to the public ... had the flavor of an auction" because the "group-based funding system" permitted interest groups to "bid on various elections." (Caliguri Aff. Ex. F (Jan. 12, 1993 Testimony of Wy Spano before the Senate Ethics and Campaign Reform Committee).) Indeed, the aggregate limit was designed to prevent PACs and other organizations "that can fund millions of dollars into campaigns" from unleashing a "flood of money" to effectively "control[ ] the Capitol." (Caliguri Aff. Ex. G (April 7, 1993 House Floor Debate on H.F. 163 (remarks of Rep. Weaver)).) Because " '[t]he ability of political committees having similar interests to join together and make large contributions tends to undermine the effectiveness and integrity of the present system of limits on contributions,' " the government has a compelling

---

8. For the purposes of subdivision 11, a "large contributor" is defined as "an individual, other than the candidate, who contributes an amount that is more than $100 and more than one-half the amount an individual may contribute." *Id.*

interest in "limit[ing] the impact of huge special interest contributions on a candidate ... to prevent either actual corruption or the appearance of corruption." *Gard v. Wisconsin State Elections Bd.*, 156 Wis.2d 28, 456 N.W.2d 809, 822–23 (1990) (quoting the Report of the Committee on Rules and Administration, S.Rep. 101–253, 101st Cong., 2d Sess. (1990)).

The aggregate limit closely meets this interest. By focusing on the *predominance* of PAC and other special interest money in individual campaigns, the aggregate limit targets "the narrow aspect of political association where the actuality and potential for corruption have been identified." *Buckley*, 424 U.S. at 28, 96 S.Ct. 612. While the aggregate limit–like any limit–functions as a ban once the candidate reaches it, the "long-recognized rationale of combating [the] circumvention of contribution limits," *Colorado Republican*, 533 U.S. at 456 n. 18, 01 Cal. Daily Op. Serv. 5225, is more than sufficient to justify it. Under this provision, CSPC is "free to engage in independent political expression, to associate actively through volunteering [ ] services," *Buckley*, 424 U.S. at 28, 96 S.Ct. 612, and to provide direct donations to candidates and committees below the cap. *See Montana Right to Life*

*Ass'n*, 343 F.3d at 1098. Accordingly, because the aggregate limit "avoid[s] unnecessary abridgment of associational freedoms," *Buckley*, 424 U.S. at 25, 96 S.Ct. 612, the Court finds that it is closely drawn and passes constitutional scrutiny.

## II. Restriction on Charitable Solicitations

 MCCL has alleged that Minn. Stat. § 211B.08, which prohibits charitable organizations from requesting donations from candidates or political committees, violates the First Amendment. Originally enacted in 1912, Minn.Stat. § 211B.08 ("the solicitation ban") states:

A religious, charitable, or educational organization[9] may not request a candidate or committee to contribute to the organization, to subscribe for the support of a club or organization, to buy tickets to entertainment, or to pay for space in a publication. This section does not apply to:

(1) the solicitation of a business advertisement in periodicals in which the candidate was a regular contributor, before candidacy;

(2) ordinary business advertisements;

---

9. The Court requested additional briefing on whether the narrow application of the statute to "religious, charitable, or educational organization[s]" turns the restriction into a content-based restriction on speech. After reviewing the parties' papers, the Court concludes that it does not. "[T]he principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Hill v. Colorado*, 530 U.S. 703, 718, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). There is no indication here that Minnesota limited the scope of the statute to those entities based on the content of their speech. Rather, Minnesota–like the 16 other states to adopt similar legislation in the early part of this century–appears to have enacted its restriction out of concern that

those requests were essentially "thinly veiled requests for bribe money." Earl R. Silas, *State and Federal Corrupt–Practices Legislation* (1928). As stated by Governor Emmet O'Neal of Alabama,

When I was a candidate for governor, I was confronted with the proposition that almost every church in the State needed a coat of paint, and invitations came for donations, with a reminder that my failure to comply with their modest request might secure the opposition of the community.

*Id.* Because there is no indication of any "significant number of communications, raising the same problem that the statute was enacted to solve, that fall outside the statute's scope," *Hill*, 530 U.S. at 723, 120 S.Ct. 2480, the Court finds that Minn.Stat. § 211B.08 is content-neutral.

(3) regular payments to a religious, charitable, or educational organization, of which the candidate was a member, or to which the candidate was a contributor for more than six months before candidacy; or

(4) ordinary contributions at church services.

Minn.Stat. § 211B.08.

 As a general rule, charitable fund-raising involves speech that is fully protected by the First Amendment. *Riley v. National Fed'n of the Blind*, 487 U.S. 781, 787–88, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). "A government regulation that directly and substantially limits charitable solicitation activity cannot be sustained unless (i) 'it serves a sufficiently strong, subordinating interest that the [State] is entitled to protect,' and (ii) is narrowly drawn to serve that interest 'without unnecessarily interfering with First Amendment freedoms.'" *National Fed'n of the Blind v. Pryor*, 258 F.3d 851, 854–55 (8th Cir.2001) (quoting *Secretary of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 960–61, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984)).

The solicitation ban directly and substantially limits charitable solicitation. Under Minn.Stat. § 211B.06, a charitable, religious, or educational organization is forbidden from requesting donations from a candidate or political committee unless certain conditions are met. This is a direct regulation and also a substantial one, insofar as the effect of the regulation on the organizations' relationships with this pool of contributors. Accordingly, the solicitation ban can only be sustained if it is narrowly drawn to serve a sufficiently strong interest. *National Federation of the Blind*, 258 F.3d at 855. The Court finds that it is.

Minnesota has a strong, subordinating interest in preventing organizations from soliciting money from candidates in exchange for votes. While Plaintiffs argue that "candidates are not corrupted by contributing to an organization that 'sells' its members votes" (Pls.' Mem Opp'g Defs.' Mot. for Summ. J. at 13), the Court strongly disagrees: Exchanging money for political favors corrupts both the donor and the donee. Were organizations able to coerce contributions from candidates in exchange for the votes of their members, candidates would be under extraordinary pressure to "buy" blocks of votes, rather than earn them through the ordinary political process. While such a "subversion of the political process," *Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985), would undoubtedly enhance the influence of these organizations, "confidence in the system of representative Government ... [would be] eroded to a disastrous extent." *Civil Service Comm'n v. Letter Carriers*, 413 U.S. 548, 565, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). Minnesota's interest is therefore a strong one.

The solicitation ban narrowly addresses that interest. "The [government] may serve its legitimate interests, but it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms." *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 636, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). Here, the exceptions laid out in subsections (1) through (4) exempt solicitation unlikely to affect the State's interest. Thus, regular church donations, longstanding donative relationships, and business advertisements are all exempted. Because this sort of "[p]recision of regulation" is "the touchstone" of valid legislation, *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (citations omitted), the solicitation ban is narrowly tailored and consistent with the First Amendment.

### III. Lobbyist Disclosure Requirements

▮ MCCL challenges the lobbyist disclosure requirements of Minn.Stat. § 10A.04. Under Minn. Stat § 10A.04:

A lobbyist must report each original source of money in excess of $500 in any year used for the purpose of lobbying to influence legislative action, administrative action, or the official action of a metropolitan governmental unit. The list must include the name, address and employer, or, if self employed, the occupation and principal place of business of each payer of money in excess of $500.

Minn.Stat. § 10A.04, subd. 4(d).[10]

MCCL argues that the disclosure requirement violates the First Amendment by requiring it to disclose the names of donors whose gifts were spent on issue advocacy rather than lobbying. Defendants counter that the interests in regulating lobbying outweigh MCCL's asserted First Amendment interests. Defendants are correct.

▮ While "compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights," there are nonetheless "government inter-ests sufficiently important to outweigh the possibility of infringement, particularly when the free functioning of our [governmental] institutions is involved." *Buckley*, 424 U.S. at 66, 96 S.Ct. 612 (internal quotation omitted). With regard to a materially similar predecessor statute, the Eighth Circuit found that the interest in "providing voters with important information about the candidates, deterring corruption, and avoiding the appearance of corruption … outweighs any infringement of … first amendment rights." *Minnesota State Ethical Practices Bd. v. National Rifle Ass'n*, 761 F.2d 509, 512 (8th Cir. 1985). Here, Plaintiffs have not provided evidence of "extreme hardship" unrecognized by the statutory scheme in which individual interest "might outweigh the State's interest in disclosure." *Id.* Rather, they assert First Amendment interests no more or less significant than the associational rights claimed by the National Rifle Association almost twenty years ago. *Id.* at 513. As the Eighth Circuit found then, MCCL's interest in the privacy of its donor list–while significant–is outweighed by Minnesota's interest in disclosure. Accordingly, under the clear law of the Eighth Circuit, Minn.Stat. § 10A.04 is constitutional.[11]

---

**10.** At the request of Plaintiffs' counsel, the Campaign Finance and Disclosure Board issued an advisory opinion on January 25, 2002. Under this opinion:

The lobbyist principal must provide the lobbyists with a list of all individuals and associations who earmark the aggregate contribution of over $500 for lobbying purposes, and those individuals whose aggregate contributions multiplied by the percentage of the budget the lobbyist principal used for lobbying is greater than $500. For example, [assume] a lobbyist principal uses 50 percent of its total budget for lobbying in Minnesota. If an individual or association contributed over $1,000 to the lobbyist principal, the individual's name, address, employer, or if self-employed, the occupation and place of business, must be disclosed to the Board.

*See* Am. Verified Compl. Ex. P.

**11.** MCCL also half-heartedly argues that the Campaign Finance and Disclosure Board's advisory opinion (issued at its own request) renders the disclosure requirement vague because (1) an organization cannot determine the percentage of its budget spent on lobbying unless it knows how to account for general staff pay, overhead, or administrative expenses, and (2) it does not account for unforseen changes, such as the pendency of significant legislation or altered contribution levels. Neither of these arguments, however, identifies any imprecision that "rise[s] to constitutional proportions," *Richey v. Tyson*, 120 F.Supp.2d 1298, 1320 (S.D.Ala.2000), and could be easily solved by requesting another advisory opinion pursuant to Minn.Stat. § 10A.02, subd. 12.

## IV. Campaign Material and Disclaimers

 MCCL challenges the constitutionality of Minn.Stat. § 211B.01, subd. 2, which defines "campaign material," and § 211B.04, which requires campaign material to carry an attribution as to its source. MCCL argues (1) that the definition of "campaign material" is void for vagueness, and (2) that the substantive disclaimer requirements do not sufficiently allow for anonymous speech.[12] The Court agrees.

### A. Campaign Material

Under Minn.Stat. § 211B.02, subd. 1, "campaign material" is defined as "any literature, publication, or material tending to influence voting and a primary or other election, except for news items or editorial comments by the news media." MCCL contends that this definition is unconstitutionally vague.

 A law is void for vagueness if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited" or fails to establish guidelines to prevent "arbitrary and discriminatory enforcement" of the law. *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). A law is unconstitutionally vague if "men of common intelligence must necessarily guess at its meaning." *Broadrick v. Oklahoma,* 413 U.S. 601, 607, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

The definition of "campaign material" is not sufficiently definite. Under the statute, "campaign material" is defined as material that "*tend[s] to influence* voting in a primary or other election." Minn.Stat. § 211B.01, subd. 2 (emphasis added). Unlike the definitions of "campaign commit-

tee" and "campaign fund" discussed below, Minn.Stat. § 211B.01, subd. 2, does not turn on the purpose of the speaker. Rather, it depends upon the necessarily unknowable *effect* that the speaker's communication has upon others. Under the First Amendment, a speaker cannot be placed "wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning." *Thomas v. Collins,* 323 U.S. 516, 535, 65 S.Ct. 315, 89 L.Ed. 430 (1945), *as quoted in Buckley,* 424 U.S. at 43, 96 S.Ct. 612; *see also Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (invalidating ordinance that made it a crime for persons to "conduct themselves in a manner annoying to persons passing by"); *City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (invalidating gang loitering ordinance that made it a crime to "remain in any one place with no apparent purpose").

The definition of "campaign material" depends upon the reaction of voters to a given communication. Because "a speaker, in such circumstances, could not safely assume how anything he might say would be understood by others," *Iowa Right to Life v. Williams,* 187 F.3d 963, 969 (8th Cir.1999), the definition of campaign material as "any literature, publication, or material *tending to influence voting,*" Minn. Stat. § 211B.01, subd. 2 (emphasis added), is unconstitutionally vague.

### B. Disclaimer Requirement

 MCCL also asserts that the disclaimer requirements that apply to campaign material violate its right to speak anonymously. The main substantive pro-

---

12. While Defendants challenge MCCL's standing to challenge the disclaimer requirements, there can be little doubt but that compelled speech in violation of the First Amendment constitutes sufficient injury-in-fact to confer standing. *See, e.g., Fry v. Board of Regents of University of Wis.,* 132 F.Supp.2d 740, 742–43 (W.D.Wis.2000).

vision governing campaign material, Minn. Stat. § 211B.04(a), states:

> A person who participates in the preparation or dissemination of campaign material other than [for paid advertisements] that does not prominently include the name and address of the person or committee causing the material to be prepared or disseminated in a disclaimer ... is guilty of a misdemeanor.

The format of the disclaimer is set out in detail in Minn.Stat. §§ 211B.04(b), (c), and (d), while subsection (e) exempts "objects stating only the candidate's name and the office sought, fundraising tickets, or personal letters that are clearly being sent by the candidate." Minn.Stat. § 211B.04(b)-(e).

In *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), the Supreme Court struck down an Ohio statute that made it a crime to distribute anonymous campaign material. Unlike the disclosure requirements upheld in *Buckley*, the Ohio statute did not "control the mechanics of the electoral process," but rather regulated "pure speech." *McIntyre*, 514 U.S. at 345, 115 S.Ct. 1511.

> Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation–and their ideas from suppression–at the hand of an intolerant society. The right to remain anonymous may be abused when it shields fraudulent conduct. But political speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse.

*Id.* at 357, 115 S.Ct. 1511 (internal citations omitted).

Following the Supreme Court's holding in *McIntyre*, the Office of the Minnesota Attorney General–which is currently defending the legislation–released an opinion stating that Minn.Stat. § 211B.04 was "clearly unconstitutional." Op. At. Gen., 82t, Aug. 27, 1997.

> We do not ordinarily undertake to determine the constitutionality of state statutes since this office may deem it appropriate to intervene and defend challenges to the constitutionality of statutes. However, in the exceptional circumstance where the United States Supreme Court has unambiguously decided the constitutionality of a statute that cannot be fairly distinguished from the statute at issue and an opinion on the constitutionality of the statute would serve the public interest, we do not feel precluded from addressing such an inquiry. Such is the case here.

*Id.* (internal citations omitted).

In response to this opinion, the legislature debated how best to amend Minn. Stat. § 211B.04. Many legislators were concerned that anonymity would fuel irresponsible allegations. Representative (now Governor) Tim Pawlenty recounted an "ugly, ugly chapter in Eagan's history" where "wildly exaggerat[ed] flyers and brochures" were distributed anonymously. (Calaguri Aff. Ex. H.) Another legislator was concerned that "anonymity doesn't promote responsibility." (*Id.* Ex. J.) Representative Bob Milbert stated:

> [M]y feeling is that, that uh, at least if the individual feels that they have to publicly make this statement, there'd be some restraint shown. I think to, to literally change our law to encourage people to anonymously get involved in

political speech, in my opinion at least, is going to ratchet down even further the level of the debate during the elections and it, it's uh, something I certainly don't support, uh, unless we're under a direct threat by a court to do it.

(*Id.* Ex. I.)

In the end, the legislature chose to amend § 211B.04 in the narrowest possible fashion, essentially exempting the exact factual scenario before the Court in *McIntyre*. Subsection (f) now reads:

> This section does not apply to an individual who acts independently of any candidate, committee, political committee, or political fund and spends only from the individual's own resources a sum that is less than $300 in the aggregate to produce or distribute campaign material that is distributed at least 14 days before the election to which the material relates.

Minn.Stat. § 211B.04(f).

The Supreme Court's holding in *McIntyre*, however, is far broader than subsection (f) allows. While a more limited disclaimer requirement might indeed pass constitutional scrutiny, *see Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637, 643 (6th Cir.1997), Minnesota's disclaimer requirement directly attacks core political speech "[un]supported by an interest in avoiding the appearance of corruption," *McIntyre*, 514 U.S. at 354, 115 S.Ct. 1511. Unlike disclosures related to lobbyists, "who have direct access to elected representatives" and thus "may well present the appearance of corruption" if their activities are not disclosed, Minnesota's disclaimer requirement "rests on different and less powerful state interests," such as ensuring responsible campaigning. *Id.* at 356, 115 S.Ct. 1511. Our society, however, "accords greater weight to the value of free speech than to the dangers of its misuse," *id.* at 357, 115 S.Ct. 1511, and unlike "ordinary election restriction[s]," § 211B.04 is a "lim-

itation on political expression subject to exacting scrutiny," *id.* at 346, 115 S.Ct. 1511. With no overriding interest supporting the statute, § 211B.04 cannot pass constitutional muster.

Representative Milbert indicated an unwillingness to broaden the statute unless the legislature was "under a direct threat by a court to do it." (Caliguri Aff. Ex. I.) That day has come. The Court finds that Minn.Stat. § 211B.04 is unconstitutional under the First Amendment.

## V. Definitions of Political Committee and Political Fund

■ Finally, MCCL challenges the definitions of "political committee" and "political fund" as provided in Minn.Stat. § 10A.01. Subdivision 27 reads as follows:

> "Political committee" means an association whose major purpose is to influence the nomination or election of a candidate or to promote or defeat a ballot question, other than a principal campaign committee or a political party unit.

Minn.Stat. § 10A.01, subd. 27. Subdivision 28 reads:

> "Political fund" means an accumulation of dues or voluntary contributions by an association other than a political committee, principal campaign committee, or party unit, of the accumulation is collected or expended to influence the nomination or election of a candidate or to promote or defeat a ballot question.

Minn.Stat. § 10A.01, subd. 28.

MCCL argues that the phrase "to influence the nomination or election of a candidate" from each definition is vague, overbroad, and regulates political speech. Defendants contend that the phrase should be construed in a manner consistent with *Buckley*, and, if so construed, MCCL lacks standing. Defendants are correct.

## A. Statutory Construction

In *Buckley,* the Supreme Court construed the phrase "for the purpose of . . . influencing" an election or nomination. 424 U.S. at 77, 96 S.Ct. 612. While noting that "the ambiguity of this phrase . . . poses constitutional problems," the Court acknowledged its obligation "to construe the statute . . . to avoid the shoals of vagueness." *Id.* at 77–78, 96 S.Ct. 612. Accordingly, the Court construed the phrase to include only "organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Id.* at 79, 96 S.Ct. 612. As applied to individuals other than the candidate or groups other than political committees, the Court found that "the relation of the information sought to the purposes of the Act may be too remote" and thus construed the phrase "to reach only funds that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80, 96 S.Ct. 612.

 Following *Buckley,* the Minnesota legislature modified its own definitions to track the federal act. Thus, the language of Minn.Stat. § 10A.01's phrasing, "to influence the nomination or election of a candidate," is now materially similar to the "for the purpose of . . . influencing" language of the federal act. Under Minnesota law, "[w]here the state statute is the same or substantially the same as the federal act from which it was copied, the prior construction of the federal statute should be deemed controlling . . . in construing the state statute." *State v. Stickney,* 213 Minn. 89, 5 N.W.2d 351, 352 (1942); *see also National Rifle Ass'n,* 761 F.2d at 512 (noting that Minnesota's disclosure requirements "parallel those in the [federal] Campaign Act"). Accordingly, the Court construes the definition of "political committee" consistent with *Buckley* to require that an organization's major purpose be the nomination or election of a candidate, and the definition of "political fund" to require that the fund be used for express advocacy.

## B. Standing

 So construed, MCCL lacks standing to challenge the statute's definitions of "political committee" and "political fund." In its Amended Verified Complaint, MCCL states that its "major purpose is *not* to nominate, elect or defeat candidates." (Am. Verified Compl. ¶ 30 (emphasis added).) Likewise, it also clearly asserts that it "does *not* engage in 'express advocacy.'" (Id. ¶ 32 (emphasis added).) Where a statute "excludes [plaintiff organizations] from its purview," dismissal for lack of standing is appropriate. *National Right to Life v. Connor,* 323 F.3d 684, 691 (8th Cir.2003); *see also Virginia Soc. for Human Life, Inc. v. Caldwell,* 152 F.3d 268, 273 (4th Cir.1998) (holding that phrase "for the purpose of influencing the outcome of an election," when in accord with *Buckley,* precluded standing for plaintiff organization). Because MCCL has placed itself outside the ambit of these definitions, it lacks the standing to contest them before the Court.

## Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED:**

1. Plaintiffs' Motion for Summary Judgment (Doc. No. 18)[13] is **GRANTED IN PART;**

 a. the Clerk of Court shall enter partial judgment **DECLARING** Minn. Stat. §§ 211B.01, subd. 2, and 211B.04 **UNCONSTITUTIONAL**

---

**13.** Plaintiffs' Motion for Preliminary Injunction (Doc. No. 18) was converted to a Motion for Summary Judgment by the Court's June 17, 2003 Order (Doc. No. 41).

under the First Amendment to the United States Constitution and **PERMANENTLY ENJOINING** Defendants from enforcing these statutes against Plaintiffs;

b. Plaintiffs' Motion for Summary Judgement (Doc. No. 18) is **DENIED** in all other respects;

2. Defendants' Motion for Summary Judgment (Doc. No. 37) is **GRANTED IN PART**; The Clerk of Court shall enter partial judgment in favor of Defendants with regard to Counts I (except as it relates to Minn.Stat. § 211B.01, subd. 2), III, IV, V, VI, VII, VIII of the Amended Verified Complaint;

3. Any and all remaining claims are **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**