# FEDERAL ELECTION COMMISSION *v.* BEAUMONT ET AL.

No. 02–403.   Argued March 25, 2003—Decided June 16, 2003

148

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, GINSBURG, and BREYER, JJ., joined. KENNEDY, J., filed an opinion concurring in the judgment, *post*, p. 163. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, *post*, p. 164.

*Deputy Solicitor General Clement* argued the cause for petitioner. With him on the briefs were *Solicitor General Olson, Assistant Attorney General McCallum, Gregory G. Garre, Douglas N. Letter, Edward Himmelfarb,* and *Jonathan H. Levy.*

*James Bopp, Jr.,* argued the cause for respondents. With him on the brief were *Richard E. Coleson* and *Thomas J. Marzen.**

*Briefs of *amici curiae* urging reversal were filed for the Association of Trial Lawyers of America by *Jeffrey Robert White;* for the Brennan Center for Justice at New York University School of Law by *Burt Neuborne, Frederick A. O. Schwarz,* and *Deborah Goldberg;* and for Public Citizen, Inc., et al. by *Scott L. Nelson, Alan B. Morrison,* and *David C. Vladeck.*

Briefs of *amici curiae* urging affirmance were filed for the American Taxpayers Alliance by *Alan P. Dye;* for the Pacific Legal Foundation by *Deborah J. La Fetra;* and for RealCampaignReform.org, Inc., et al. by *William J. Olson, John S. Miles,* and *Herbert W. Titus.*

JUSTICE SOUTER delivered the opinion of the Court.

Since 1907, federal law has barred corporations from contributing directly to candidates for federal office. We hold that applying the prohibition to nonprofit advocacy corporations is consistent with the First Amendment.

# I

The current statute makes it "unlawful . . . for any corporation whatever . . . to make a contribution or expenditure in connection with" certain federal elections, 90 Stat. 490, as renumbered and amended, 2 U. S. C. § 441b(a), "contribution or expenditure" each being defined to include "anything of value," § 441b(b)(2). The prohibition does not, however, forbid "the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes." § 441b(b)(2)(C); see § 431(4)(B). Such a PAC (so called after the political action committee that runs it) may be wholly controlled by the sponsoring corporation, whose employees and stockholders or members generally may be solicited for contributions. See §§ 441b(b)(4)(B)–(C); *Federal Election Comm'n* v. *National Right to Work Comm.*, 459 U. S. 197, 200, n. 4 (1982). While federal law requires PACs to register and disclose their activities, §§ 432–434; see *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238, 253–254 (1986), the law leaves them free to make contributions as well as other expenditures in connection with federal elections, § 441b(b)(2)(C).

Respondents are a corporation known as North Carolina Right to Life, Inc., three of its officers, and a North Carolina voter (here, together, NCRL), who have sued the Federal Election Commission, the independent agency set up to "administer, seek to obtain compliance with, and formulate policy with respect to" the federal electoral laws. § 437c

(b)(1). NCRL challenges the constitutionality of § 441b and the FEC's regulations implementing that section, 11 CFR §§ 114.2(b), 114.10 (2003), but only so far as they apply to NCRL. The corporation is organized under the laws of North Carolina to provide counseling to pregnant women and to urge alternatives to abortion, and as a nonprofit advocacy corporation it is exempted from federal taxation by § 501(c)(4) of the Internal Revenue Code, 26 U. S. C. § 501(c)(4).[1] It has no shareholders and, although it receives some donations from traditional business corporations, it is "overwhelmingly funded by private contributions from individuals." App. 14. NCRL has made contributions and expenditures in connection with state elections, but not federal, owing to 2 U. S. C. § 441b. Instead, it has established a PAC, the North Carolina Right to Life, Inc., Political Action Committee, which has contributed to federal candidates. See *North Carolina Right to Life, Inc.* v. *Bartlett,* 168 F. 3d 705, 709 (CA4 1999), cert. denied, 528 U. S. 1153 (2000).

The District Court granted summary judgment to NCRL and held § 441b unconstitutional as applied to the corporation, both as to direct contributions and independent expenditures. 137 F. Supp. 2d 648 (EDNC 2000). A divided Court of Appeals for the Fourth Circuit affirmed, 278 F. 3d 261 (2002), relying primarily on *Massachusetts Citizens for Life,* in which this Court held it unconstitutional to apply the statute to independent expenditures by Massachusetts Citizens for Life, Inc., a nonprofit advocacy corporation in some re-

---

[1] Section 501(c)(4)(A) grants exemption to "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, . . . the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes." An organization "may carry on lawful political activities and remain exempt under section 501(c)(4) as long as it is primarily engaged in activities that promote social welfare." Rev. Rul. 81–95, 1981–1 Cum. Bull. 332. Unlike contributions to § 501(c)(3) organizations, donations to those recognized under § 501(c)(4) are not tax deductible. See *Regan* v. *Taxation With Representation of Wash.,* 461 U. S. 540, 543 (1983).

spects like NCRL. The Court of Appeals ruled, first, that the prohibition on independent expenditures may not be applied to NCRL. Although the panel acknowledged that Massachusetts Citizens for Life, unlike NCRL, had a formal policy against accepting corporate donations, see *Massachusetts Citizens for Life, supra,* at 263–264 (describing this feature of the organization as "essential to our holding"), it nevertheless treated NCRL as materially indistinguishable from Massachusetts Citizens for Life.

To the point for present purposes, the Court of Appeals went on to hold the ban on direct contributions likewise unconstitutional as applied to NCRL. While the majority of the divided court recognized that regulation of campaign contributions has received greater deference under First Amendment cases than regulation of independent expenditures, 278 F. 3d, at 274 (citing *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 386–388 (2000)), it held the ban on direct contributions unjustified as applied to *"[Massachusetts Citizens for Life]*-type corporations," which it thought "pose[d] no risk of 'unfair deployment of wealth for political purposes.'" 278 F. 3d, at 275 (quoting *Massachusetts Citizens for Life, supra,* at 259). The Court of Appeals reasoned that "[t]he rationale utilized by the Court in *[Massachusetts Citizens for Life]* to declare prohibitions on independent expenditures unconstitutional as applied to [the advocacy corporation involved there] is equally applicable in the context of direct contributions." 278 F. 3d, at 275. Judge Gregory dissented from the others on this point, since he saw no way to square their conclusion with this Court's reasoning in *National Right to Work.* 278 F. 3d, at 282.

After the Fourth Circuit divided 7 to 4 in denying rehearing en banc, the FEC petitioned for certiorari solely as to the constitutionality of the ban on direct contributions.[2]  Be-

---

[2] We thus have no occasion to say whether the Court of Appeals correctly held NCRL entitled to the so-called *"Massachusetts Citizens for Life* exception" to the statute's ban on independent expenditures.

cause on that issue the Fourth Circuit is in conflict with the Sixth, see *Kentucky Right to Life, Inc.* v. *Terry*, 108 F. 3d 637, 645–646 (1997) (upholding a provision of Kentucky law analogous to § 441b), we granted certiorari, 537 U. S. 1027 (2002). We now reverse.

## II

## A

Any attack on the federal prohibition of direct corporate political contributions goes against the current of a century of congressional efforts to curb corporations' potentially "deleterious influences on federal elections," which we have canvassed a number of times before. *United States* v. *Automobile Workers*, 352 U. S. 567, 585 (1957); see *id.*, at 570–584; see also *National Right to Work*, 459 U. S., at 208–209; *Pipefitters* v. *United States*, 407 U. S. 385, 402–412 (1972); *United States* v. *CIO*, 335 U. S. 106, 113–115 (1948). The current law grew out of a "popular feeling" in the late 19th century "that aggregated capital unduly influenced politics, an influence not stopping short of corruption." *Automobile Workers, supra,* at 570. A demand for congressional action gathered force in the campaign of 1904, which made a national issue of the political leverage exerted through corporate contributions, and after the election and new revelations of corporate political overreaching, President Theodore Roosevelt made banning corporate political contributions a legislative priority. R. Mutch, Campaigns, Congress, and Courts: The Making of Federal Campaign Finance Law 1–8 (1988); see *Automobile Workers,* 352 U. S., at 571–575. Although some congressional proposals would have "prohibited political contributions by [only] certain classes of corporations," *id.,* at 573, the momentum was "for elections 'free from the power of money,'" *id.,* at 575 (citation omitted), and Congress acted on the President's call for an outright ban, not with half measures, but with the Tillman Act, ch. 420, 34 Stat. 864. This "first federal campaign finance law," Mutch, *supra,* at

xvii, banned "any corporation whatever" from making "a money contribution in connection with" federal elections, 34 Stat. 864–865.

Since 1907, there has been continual congressional attention to corporate political activity, sometimes resulting in refinement of the law, sometimes in overhaul.[3] One feature, however, has stayed intact throughout this "careful legislative adjustment of the federal electoral laws," *National Right to Work, supra,* at 209, and much of the periodic amendment was meant to strengthen the original, core prohibition on direct corporate contributions. The Foreign Corrupt Practices Act of 1925, for example, broadened the ban on contributions to include "anything of value," and criminalized the act of receiving a contribution to match the criminality of making one. Ch. 368, §§ 302, 313, 43 Stat. 1070, 1074. So, in another instance, the 1947 Labor Management Relations Act drew labor unions permanently within the law's reach and invigorated the earlier prohibition to include "expenditure[s]" as well. Ch. 120, § 304, 61 Stat. 159; see *Pipefitters, supra,* at 402.

Today, as in 1907, the law focuses on the "special characteristics of the corporate structure" that threaten the integrity of the political process. *National Right to Work,* 459 U. S., at 209; see *id.,* at 207; see also *Austin* v. *Michigan Chamber of Commerce,* 494 U. S. 652, 658–659 (1990); *Massachusetts Citizens for Life,* 479 U. S., at 257–258; *Federal Election Comm'n* v. *National Conservative Political Action Comm.,* 470 U. S. 480, 500–501 (1985). As we explained it in *Austin,*

---

[3] See, *e. g.,* Act of June 25, 1910, ch. 392, 36 Stat. 822; Act of Aug. 19, 1911, ch. 33, 37 Stat. 25; Federal Corrupt Practices Act, 1925, ch. 368, 43 Stat. 1070; Act of July 19, 1940 (Hatch Act), 54 Stat. 767; War Labor Disputes Act, 1943, ch. 144, § 9, 57 Stat. 167; Labor Management Relations Act, 1947, § 304, 61 Stat. 159; Act of Oct. 31, 1951, § 21, 65 Stat. 718; Federal Election Campaign Act of 1971 (FECA), 86 Stat. 3; FECA Amendments of 1974, 88 Stat. 1263; FECA Amendments of 1976, 90 Stat. 475; FECA Amendments of 1979, 93 Stat. 1339; Bipartisan Campaign Reform Act of 2002, 116 Stat. 81.

> "State law grants corporations special advantages—such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets— that enhance their ability to attract capital and to deploy their resources in ways that maximize the return on their shareholders' investments. These state-created advantages not only allow corporations to play a dominant role in the Nation's economy, but also permit them to use 'resources amassed in the economic marketplace' to obtain 'an unfair advantage in the political marketplace.'" 494 U. S., at 658–659 (quoting *Massachusetts Citizens for Life, supra,* at 257).

Hence, the public interest in "restrict[ing] the influence of political war chests funneled through the corporate form." *National Conservative Political Action Comm., supra,* at 500–501; see *National Right to Work, supra,* at 207 ("[S]ubstantial aggregations of wealth amassed by the special advantages which go with the corporate form of organization should not be converted into political 'war chests' which could be used to incur political debts from legislators").

As these excerpts from recent opinions show, not only has the original ban on direct corporate contributions endured, but so have the original rationales for the law. In barring corporate earnings from conversion into political "war chests," the ban was and is intended to "preven[t] corruption or the appearance of corruption." *National Conservative Political Action Comm., supra,* at 496–497; see also *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765, 788, n. 26 (1978) ("The importance of the governmental interest in preventing [corruption] has never been doubted"). But the ban has always done further duty in protecting "the individuals who have paid money into a corporation or union for purposes other than the support of candidates from having that money used to support political candidates to whom they may be opposed." *National Right to Work, supra,* at 208;

see *CIO,* 335 U. S., at 113; see also *Austin, supra,* at 673–678 (Brennan, J., concurring).

Quite aside from war-chest corruption and the interests of contributors and owners, however, another reason for regulating corporate electoral involvement has emerged with restrictions on individual contributions, and recent cases have recognized that restricting contributions by various organizations hedges against their use as conduits for "circumvention of [valid] contribution limits." *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.,* 533 U. S. 431, 456, and n. 18 (2001); see *Austin, supra,* at 664. To the degree that a corporation could contribute to political candidates, the individuals "who created it, who own it, or whom it employs," *Cedric Kushner Promotions, Ltd.* v. *King,* 533 U. S. 158, 163 (2001), could exceed the bounds imposed on their own contributions by diverting money through the corporation, cf. *Colorado Republican,* 533 U. S., at 446–447. As we said on the subject of limiting coordinated expenditures by political parties, experience "demonstrates how candidates, donors, and parties test the limits of the current law, and it shows beyond serious doubt how contribution limits would be eroded if inducement to circumvent them were enhanced." *Id.,* at 457.

In sum, our cases on campaign finance regulation represent respect for the "legislative judgment that the special characteristics of the corporate structure require particularly careful regulation." *National Right to Work, supra,* at 209–210. And we have understood that such deference to legislative choice is warranted particularly when Congress regulates campaign contributions, carrying as they do a plain threat to political integrity and a plain warrant to counter the appearance and reality of corruption and the misuse of corporate advantages. See, *e. g., Buckley* v. *Valeo,* 424 U. S. 1, 26–28, 47 (1976) *(per curiam).* As we said in *Colorado Republican,* "limits on contributions are more clearly justified by a link to political corruption than limits on other

kinds of . . . political spending are (corruption being understood not only as *quid pro quo* agreements, but also as undue influence on an officeholder's judgment, and the appearance of such influence)." 533 U. S., at 440–441 (citation omitted).

## B

That historical prologue would discourage any broadside attack on corporate campaign finance regulation or regulation of corporate contributions, and NCRL accordingly questions § 441b only to the extent the law places nonprofit advocacy corporations like itself under the general ban on direct contributions. But not even this more focused challenge can claim a blank slate, for Judge Gregory rightly said in his dissent that our explanation in *National Right to Work* all but decided the issue against NCRL's position.

*National Right to Work* addressed the provision of § 441b restricting a nonstock corporation to its membership when soliciting contributions to its PAC,[4] and we considered whether a nonprofit advocacy corporation without members of the usual sort could be held to violate the law by soliciting a donation to its PAC from any individual who had at one time contributed to the corporation. See 459 U. S., at 199–200. We sustained the FEC's position that a fund drive as broad as this went beyond the solicitation of "members" permitted by § 441b, and we invoked the history distilled above in holding that the statutory restriction was no infringement on those First Amendment associational rights closely akin to speech. *Id.*, at 206–209. We concluded that the congressional judgment to regulate corporate political involvement

---

[4] Section 441b(b)(4)(A) bars a corporation from soliciting contributions to a PAC established by the corporation, except from stockholders or other specified categories of persons. Section 441b(b)(4)(C), the specific provision at issue in *National Right to Work*, provides, in relevant part, that § 441b(b)(4)(A) "shall not prevent a . . . corporation without capital stock . . . from soliciting contributions to [a PAC established by the corporation] from members of such . . . corporation."

"warrants considerable deference" and "reflects a permissible assessment of the dangers posed by [corporations] to the electoral process." *Id.*, at 207–211.

It would be hard to read our conclusion in *National Right to Work*, that the PAC solicitation restrictions were constitutional, except on the practical understanding that the corporation's capacity to make contributions was legitimately limited to indirect donations within the scope allowed to PACs. See, *e. g., id.*, at 208 (reviewing both "the statutory prohibitions and exceptions"). In fact, we specifically rejected the argument made here, that deference to congressional judgments about proper limits on corporate contributions turns on details of corporate form or the affluence of particular corporations. In the same breath, we remarked on the broad applicability of § 441b to "corporations and labor unions without great financial resources, as well as those more fortunately situated," and made a point of refusing to "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *Id.*, at 210.

Later cases have repeatedly acknowledged, without questioning, the reading of *National Right to Work* as generally approving the § 441b prohibition on direct contributions, even by nonprofit corporations "without great financial resources." *Ibid.* In *National Conservative Political Action Committee*, for example, we not only spoke of *National Right to Work* as consistent with "the well-established constitutional validity of legislative regulation of corporate contributions to candidates for public office," but went on to reaffirm that the Court in that case had "rightly concluded that Congress might include, along with labor unions and corporations traditionally prohibited from making contributions to political candidates, membership corporations, though contributions by the latter might not exhibit all of the evil that contributions by traditional economically organized corporations exhibit." 470 U. S., at 495, 500; see *id.*, at 500 (describ-

ing *National Right to Work* as giving "proper deference to a congressional determination of the need for a prophylactic rule"). Relying again on *National Right to Work,* we made a similar point in *Austin* when we sustained Michigan's ban on direct corporate contributions, even though the ban "include[d] within its scope closely held corporations that do not possess vast reservoirs of capital." 494 U. S., at 661. "Although some closely held corporations, just as some publicly held ones, may not have accumulated significant amounts of wealth, they receive from the State the special benefits conferred by the corporate structure and present the potential for distorting the political process. This potential for distortion justifies [the state law's] general applicability to all corporations." *Ibid.*

But *National Right to Work* does not stand alone in its bearing on the issue here, and equal significance must be accorded to *Massachusetts Citizens for Life,* the very case upon which NCRL and the Court of Appeals have placed principal reliance. There, we held the prohibition on independent expenditures under § 441b unconstitutional as applied to a nonprofit advocacy corporation. While the majority explained generally that the "potential for unfair deployment of wealth for political purposes" fell short of justifying a ban on expenditures by groups like Massachusetts Citizens for Life that "do not pose that danger of corruption," the majority's response to the dissent pointed to a different resolution of the present case. 479 U. S., at 259. THE CHIEF JUSTICE's dissenting opinion noted that Massachusetts Citizens for Life "was not unlike" the corporation at issue in *National Right to Work,* which he read as supporting the ban on independent expenditures. 479 U. S., at 269. Without disagreeing about the similarity of the two organizations, the majority nonetheless distinguished *National Right to Work* on the ground of its addressing regulation of contributions, not expenditures. See 479 U. S., at 259–260 ("[R]estrictions on contributions require less com-

pelling justification than restrictions on independent spending"). "In light of the historical role of contributions in the corruption of the electoral process, the need for a broad prophylactic rule [against contributions] was thus sufficient in *[National Right to Work]*." *Id.*, at 260.

## C

The upshot is that, although we have never squarely held against NCRL's position here, we could not hold for it without recasting our understanding of the risks of harm posed by corporate political contributions, of the expressive significance of contributions, and of the consequent deference owed to legislative judgments on what to do about them. NCRL's efforts, however, fail to unsettle existing law on any of these points.

First, NCRL argues that on a class-wide basis *"[Massachusetts Citizens for Life]*-type corporations pose no potential of threat to the political system," so that the governmental interest in combating corruption is as weak as the Court held it to be in relation to the particular corporation considered in *Massachusetts Citizens for Life.* Brief for Respondents 19. But this generalization does not hold up. For present purposes, we will assume advocacy corporations are generally different from traditional business corporations in the improbability that contributions they might make would end up supporting causes that some of their members would not approve. See *Massachusetts Citizens for Life, supra,* at 260–262.[5] But concern about the corrupt-

---

[5] That said, this concern is not wholly inapplicable to advocacy corporations, as "persons may desire that an organization use their contributions to further a certain cause, but may not want the organization to use their money to urge support for or opposition to political candidates solely on the basis of that cause." *Massachusetts Citizens for Life,* 479 U. S., at 261. In any event, we have never intimated that the risk of corruption alone is insufficient to support regulation of political contributions. See, *e. g., Austin* v. *Michigan Chamber of Commerce,* 494 U. S. 652, 658–659 (1990); *Federal Election Comm'n* v. *National Right to Work Comm.,* 459

ing potential underlying the corporate ban may indeed be implicated by advocacy corporations. They, like their for-profit counterparts, benefit from significant "state-created advantages," *Austin, supra,* at 659, and may well be able to amass substantial "political 'war chests,'" *National Right to Work,* 459 U. S., at 207. Not all corporations that qualify for favorable tax treatment under § 501(c)(4) of the Internal Revenue Code lack substantial resources, and the category covers some of the Nation's most politically powerful organizations, including the AARP, the National Rifle Association, and the Sierra Club.[6] Nonprofit advocacy corporations are, moreover, no less susceptible than traditional business companies to misuse as conduits for circumventing the contribution limits imposed on individuals. Cf. *Austin, supra,* at 664 (noting that a nonprofit corporation is capable of "serv-[ing] as a conduit for corporate political spending").[7]

---

U. S. 197, 208 (1982); cf. *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 388–389 (2000).

[6] See http://www.aarp.org/press/disclosure.html (as visited June 12, 2003) (available in Clerk of Court's case file) (AARP); http://www.give.org/reports/index.asp (as visited June 12, 2003) (available in Clerk of Court's case file) (National Rifle Association and Sierra Club). These examples answer NCRL's argument that the *Massachusetts Citizens for Life* exception is "self-limiting." See Brief for Respondents 27 ("If [a *Massachusetts Citizens for Life*]-type corporation begins generating or receiving substantial business income or business corporation contributions, by definition, it automatically is no longer [a *Massachusetts Citizens for Life*]-type corporation" (citing *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.,* 479 U. S. 238, 263–264 (1986))). The nonprofit advocacy corporations mentioned (one of which has, in fact, been granted "*[Massachusetts Citizens for Life]*-type" status by a Court of Appeals, see, *e. g., FEC* v. *National Rifle Assn.,* 254 F. 3d 173, 192 (CADC 2001)) show that "political 'war chests'" may be amassed simply from members' contributions. 459 U. S., at 207.

[7] NCRL suggests that the Government's interest in combating circumvention of the campaign finance laws would be sufficiently met by allowing limited contributions subject to the earmarking rule of § 441a(a)(8), which provides that "contributions which are in any way earmarked or otherwise directed through an intermediate or conduit to [a] candidate" are treated as contributions to the candidate (thus triggering the disclosure require-

Second, NCRL argues that application of the ban on its contributions should be subject to a strict level of scrutiny, on the ground that § 441b does not merely limit contributions, but bans them on the basis of their source. Brief for Respondents 14–16. This argument, however, overlooks the basic premise we have followed in setting First Amendment standards for reviewing political financial restrictions: the level of scrutiny is based on the importance of the "political activity at issue" to effective speech or political association. *Massachusetts Citizens for Life*, 479 U. S., at 259; see *Colorado Republican*, 533 U. S., at 440–442, and nn. 6–7; *Nixon*, 528 U. S., at 386–388. Going back to *Buckley* v. *Valeo*, 424 U. S. 1 (1976), restrictions on political contributions have been treated as merely "marginal" speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression. See *Colorado Republican, supra,* at 440.[8] "While contributions may result in political expression if spent by a candidate or an association . . . , the transformation of contributions into political debate involves

---

ments of § 434(b)(3)(A)). Brief for Respondents 31. We rejected this precise argument, however, in *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431 (2001), where we concluded that it "ignores the practical difficulty of identifying and directly combating circumvention under actual political conditions." *Id.*, at 462. "The earmarking provision . . . would reach only the most clumsy attempts to pass contributions through to candidates. To treat the earmarking provision as the outer limit of acceptable tailoring would disarm any serious effort to limit [circumvention]." *Ibid.*

[8] Within the realm of contributions generally, corporate contributions are furthest from the core of political expression, since corporations' First Amendment speech and association interests are derived largely from those of their members, see, *e. g., NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 458–459 (1958), and of the public in receiving information, see, *e. g., First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765, 777 (1978). A ban on direct corporate contributions leaves individual members of corporations free to make their own contributions, and deprives the public of little or no material information.

speech by someone other than the contributor." *Buckley, supra,* at 20–21. This is the reason that instead of requiring contribution regulations to be narrowly tailored to serve a compelling governmental interest, "a contribution limit involving 'significant interference' with associational rights" passes muster if it satisfies the lesser demand of being " 'closely drawn' to match a 'sufficiently important interest.' " *Nixon, supra,* at 387–388 (quoting *Buckley, supra,* at 25); cf. *Austin,* 494 U. S., at 657; *Buckley, supra,* at 44–45.[9]

Indeed, this recognition that degree of scrutiny turns on the nature of the activity regulated is the only practical way to square two leading cases: *National Right to Work* approved strict solicitation limits on a PAC organized to make contributions, see 459 U. S., at 201–202, whereas *Massachusetts Citizens for Life* applied a compelling interest test to invalidate the ban on an advocacy corporation's expenditures in light of PAC regulatory burdens, see 479 U. S., at 252–255; see also *id.,* at 265–266 (opinion of O'CONNOR, J.). Each case involved § 441b, after all, and the same "ban" on the same corporate "sources" of political activity applied in both cases.

It is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself. But even when NCRL urges precisely that, and asserts that § 441b is not sufficiently "closely drawn," the claim still rests on a false premise, for NCRL is simply wrong in characterizing § 441b as a complete ban. As we have said before, the section "permits some participation of unions and corporations in the federal electoral proc-

---

[9] Judicial deference is particularly warranted where, as here, we deal with a congressional judgment that has remained essentially unchanged throughout a century of "careful legislative adjustment." *National Right to Work, supra,* at 209; cf. *Nixon, supra,* at 391 ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised").

ess by allowing them to establish and pay the administrative expenses of [PACs]." *National Right to Work, supra,* at 201; see also *Austin, supra,* at 660; *Massachusetts Citizens for Life, supra,* at 252. The PAC option allows corporate political participation without the temptation to use corporate funds for political influence, quite possibly at odds with the sentiments of some shareholders or members, and it lets the Government regulate campaign activity through registration and disclosure, see §§ 432–434, without jeopardizing the associational rights of advocacy organizations' members, see *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 462 (1958) (holding that "[c]ompelled disclosure of membership in an organization engaged in advocacy of particular beliefs" may violate the First Amendment).

NCRL cannot prevail, then, simply by arguing that a ban on an advocacy corporation's direct contributions is bad tailoring. NCRL would have to demonstrate that the law violated the First Amendment in allowing contributions to be made only through its PAC and subject to a PAC's administrative burdens. But a unanimous Court in *National Right to Work* did not think the regulatory burdens on PACs, including restrictions on their ability to solicit funds, rendered a PAC unconstitutional as an advocacy corporation's sole avenue for making political contributions. See 459 U. S., at 201–202. There is no reason to think the burden on advocacy corporations is any greater today, or to reach a different conclusion here.

### III

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE KENNEDY, concurring in the judgment.

My position, expressed in dissenting opinions in previous cases, has been that the Court erred in sustaining certain state and federal restrictions on political speech in the cam-

paign finance context and misapprehended basic First Amendment principles in doing so. See *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 409 (2000) (KENNEDY, J., dissenting); *Austin* v. *Michigan Chamber of Commerce*, 494 U. S. 652, 699 (1990) (KENNEDY, J., dissenting); *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 626 (1996) (KENNEDY, J., concurring in judgment and dissenting in part). I adhere to this view, and so can give no weight to those authorities in the instant case.

That said, it must be acknowledged that *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238 (1986) *(MCFL)*, contains language supporting the Court's holding here that corporate contributions can be regulated more closely than corporate expenditures. The language upon which the Court relies tends to reconcile the tension between the approach in *MCFL* and the Court's earlier decision in *Federal Election Comm'n* v. *National Right to Work Comm.*, 459 U. S. 197 (1982).

Were we presented with a case in which the distinction between contributions and expenditures under the whole scheme of campaign finance regulation were under review, I might join JUSTICE THOMAS' dissenting opinion. The Court does not undertake that comprehensive examination here, however. And since there is language in *MCFL* that supports today's holding, I concur in the judgment.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

I continue to believe that campaign finance laws are subject to strict scrutiny. *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431, 465–466 (2001) *(Colorado II)* (THOMAS, J., dissenting); *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 640 (1996) *(Colorado I)* (THOMAS, J., concurring in judgment and dissenting in part).

See also *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 427 (2000) (THOMAS, J., dissenting). As in *Colorado II,* the Government does not argue here that 2 U. S. C. § 441b survives review under that rigorous standard. Indeed, it could not. "[U]nder traditional strict scrutiny, broad prophylactic caps on . . . giving in the political process . . . are unconstitutional," *Colorado I,* 518 U. S., at 640–641, because, as I have explained before, they are not narrowly tailored to meet any relevant compelling state interest, *id.,* at 641–644; *Nixon, supra,* at 427–430. See also *Colorado II, supra,* at 465–466. Accordingly, I would affirm the judgment of the Court of Appeals and respectfully dissent from the Court's contrary disposition.