# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 19, 2013   Decided August 5, 2014

No. 13-5008

STOP THIS INSANITY INC EMPLOYEE LEADERSHIP FUND, ET AL.,
APPELLANTS

v.

FEDERAL ELECTION COMMISSION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-01140)

*Tara A. Brennan* argued the cause for appellants. With her on the briefs were *Tillman J. Breckenridge*, *Patricia E. Roberts*, and *Dan Backer*.

*Erin Chlopak*, Attorney, Federal Election Commission, argued the cause for appellee. With her on the brief were *Anthony Herman*, General Counsel, *Kevin Deeley*, Acting Associate General Counsel, and *Steve Hajjar*, Attorney. *Adav Noti*, Attorney, Federal Election Commission, entered an appearance.

Before: BROWN and GRIFFITH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

*Senior Circuit Judge* SENTELLE concurs in the judgment.

BROWN, *Circuit Judge.*  The iconic musician Mick Jagger famously mused, "You can't always get what you want.  But if you try sometimes, well, you just might find, you get what you need."  The Rolling Stones, *You Can't Always Get What You Want*, *on* Let It Bleed (Decca Records 1969).  Here, Stop This Insanity—a grassroots organization—*wants* to remove the congressionally-imposed binds on solicitation by separate segregated funds, a type of political action committee connected to a parent corporation.  What it *needs*, however, it already has—an unrestrained vehicle, in the form of that parent corporation, which can engage in unlimited political spending.  Because this less-obsolete and less-onerous alternative exists, we decline Stop This Insanity's invitation for us to tinker with what has become a statutory artifact.

I

The Federal Election Campaign Act sets forth ground rules for, *inter alia*, the participation of corporations in the electoral process.  *See* 2 U.S.C. § 441b; *FEC v. Beaumont*, 539 U.S. 146, 149 (2003).  Corporations, for example, cannot contribute directly to candidates for federal office or parties.  2 U.S.C. § 441b(a).  And before the Supreme Court's decision in *Citizens United v. FEC*, 558 U.S. 310 (2010), they could not use their treasuries to pay for independent expenditures, i.e., funds used to expressly advocate for or against a candidate.  *See* 2 U.S.C. § 441b(a); *see also id.* § 431(17); *Citizens United*, 558 U.S. at 320–21, 372.  But the pre-*Citizens United* landscape did not leave corporations completely exiled from the political process.  Instead, the Act permitted limited corporate participation through separate

segregated funds, a type of political action committee.  2 U.S.C. § 441b(b)(2), 431(4)(B).  "Though the treasuries of a corporation and its fund [were to be] kept separate, a corporation [could] nonetheless control how the separate segregated fund [spent] its money."  *FEC v. NRA*, 254 F.3d 173, 179–80 (D.C. Cir. 2001) (citations omitted).  A fund was "separate . . . only in the sense that there [was] a strict segregation of its monies from the corporation's other assets."  *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 200 n.4 (1982) (internal quotation marks omitted).

These funds, however, came with strings attached.  They were subject to organizational, recordkeeping, and reporting requirements.  *See* 2 U.S.C. §§ 432–34.  The Act also placed constraints on the funds' ability to solicit.  For one, the Act restricted *whom* the funds could solicit:  only the connected company's stockholders, executives, and administrative personnel, in addition to their respective families.  *See id.* § 441b(b)(4)(A)(i); *see also Citizens United*, 558 U.S. at 321.  Solicitation of the public was off limits.  *See McConnell v. FEC*, 540 U.S. 93, 118 n.3 (2003), *overruled on other grounds by Citizens United*, 558 U.S. at 310 ("As a general rule, [the Act] permits corporations . . . to solicit contributions to their PACs from their shareholders or members, but not from outsiders.").  The other major restriction came in the form of *when* the funds could solicit:  twice yearly to any corporate employee or family member thereof, with responses being anonymous.  *See* 2 U.S.C. § 441b(b)(4)(B).  But with the strings came benefits:  because the funds were so closely tied to their parent corporations, they were not required to disclose the corporation's contributions or expenditures for "the establishment, administration, and solicitation of contributions."  *Id.* § 441b(b)(2)(C).  *Citizens United*, of course, did away with the ban on corporate independent

expenditures. But the funds—now functionally obsolete—still remained.

Stop This Insanity, Inc. ("STII" or "the Corporation") is a corporation that had a past life as a "nonconnected," standalone political action committee engaged in political advocacy. *See* Appellee's Br. at 14. It later deregistered as such a committee, and instead formed a segregated fund—the Employee Leadership Fund ("the Fund"). *See* J.A. at 10. The Corporation asked the Federal Election Commission ("the Commission") for guidance on whether the Fund could open a separate unrestricted account devoted to making independent expenditures that could solicit the general public. *See* J.A. at 31–34. The Commission's response was the regulatory equivalent of a shrug—one memorandum said yes, while another one said no. *See* J.A. at 41–71. At an impasse, the Commission declined to issue advice. J.A. at 73.

Unhappy with this nonresponse, STII, the Fund, two individuals, and another corporation filed a complaint in district court, alleging the restrictions on the segregated fund were unconstitutional. J.A. at 4–11. The plaintiffs moved for a preliminary injunction. J.A. at 79–81. The Commission moved to dismiss. J.A. at 185–89. Siding with the Commission, the district court dismissed the case. *See Stop This Insanity, Inc. Employee Leadership Fund v. FEC*, 902 F. Supp. 2d 23 (D.D.C. 2012). The plaintiffs timely appealed.[1]

---

[1] We lack jurisdiction over the individuals' claims, as they were not made through the *en banc* certification process prescribed in 2 U.S.C. § 437h. *See Wagner v. FEC*, 717 F.3d 1007, 1016 (D.C. Cir. 2013).

5

II

Simply put, Stop This Insanity would like to use its segregated fund to solicit the entire public while concealing its expenses for such solicitation. It claims *Citizens United* compels such a result. Even assuming the Corporation's constitutional analysis is correct, it is far from a foregone conclusion that the Act is severable in a way that would eliminate the restrictions but leave intact the partial waiver on disclosure. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987) ("The more relevant inquiry in evaluating severability is whether the statute will function *in a manner consistent with the intent of Congress*." (emphasis added)). Thankfully, we need not make that determination, for STII's arguments fall short on the merits. We review *de novo* the district court's grant of a motion to dismiss for failure to state a claim. *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).

A

Political participation is integral to our democratic government; for this reason, limitations on political contributions and expenditures "operate in an area of the most fundamental First Amendment activities." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam). Accordingly, limits on independent expenditures, which do not implicate the anticorruption rationale, are subjected to the highest form of scrutiny and are generally unconstitutional. *See, e.g.*, *Citizens United*, 558 U.S. at 340, 357. Limits on direct contributions to candidates to avoid corruption or the appearance of corruption, however, are tolerated, subjected to a milder form of scrutiny. *See Buckley*, 424 U.S. at 25; *see also McConnell*, 540 U.S. at 140–41.

Congress crafted the segregated fund scheme at a time when this reality was not fully realized—in other words, at a time when direct participation by corporations was banned. Segregated funds were limited vehicles through which corporations could participate in the political process. *See NRA*, 254 F.3d at 179 ("Notwithstanding [the Act's] prohibition[s], . . . the statute does permit corporations to participate in the electoral process in a limited fashion."). After *Citizens United*, segregated funds became a vintage—yet still operable—relic. Though these funds have the advantage of being able to directly contribute to candidates—something parent corporations still cannot do—they are no longer necessary for independent expenditures. And yet, STII decided to form a separate segregated fund.

The crux of the Corporation's argument is simple: *Citizens United* prohibits restrictions based on distinctions between organizational entities, and such restrictions are subject to our highest form of scrutiny. Because segregated funds are singled out for the solicitation restrictions, STII reasons the constraints should be subjected to the more exacting half of the *Buckley* paradigm.

We do not share the Corporation's confidence that *Citizens United* is apposite here. This case does not present an "outright ban" on political speech, *see Citizens United*, 558 U.S. at 337; it is governmental "regulat[ion] [of] corporate political speech," not suppression, *see id.* at 319. Indeed, the *Citizens United* Court even acknowledged the existence of these segregated funds—as the so-called counterparts to the then-speechless corporate entities, the funds formed a critical part of the Court's analysis. *See id.* at 321. The Court indicated these segregated funds were capable of speaking, not unduly restrained by their various obligations. In no uncertain terms, the Court stated "a PAC created by a

corporation can still speak." *Id.* at 337; *see id.* at 338 ("PACs have to comply with these regulations just to speak."); *id.* at 339 ("PACs, furthermore, must exist before they can speak."). Never did the Court suggest the statutory scheme for segregated funds "muzzled" their speech. *See* Appellants' Br. at 15.

There are other reasons for considering *Citizens United* inapposite. The corporation in that case was thrust into a scenario where its only avenue of speech was a type of entity—the political action committee—that could not speak on behalf of the corporation and was a "burdensome alternative[]." *Id.* at 337 ("A PAC is a separate association from the corporation. . . . Even if a PAC could somehow allow a corporation to speak—and it does not—the option to form PACs does not alleviate the First Amendment problems. . . . PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations."). Contrary to the representations of Appellants' counsel at oral argument, the converse is not true. Nothing prevents the corporation from speaking on behalf of the PAC; in fact, the regulatory scheme specifically provides for such activity, albeit with strings attached. *See* 11 C.F.R. § 114.5(g). Moreover, independent expenditures are *less* burdensome through the corporate alternative. Despite the availability of a more robust option—at least, when it comes to independent expenditures—the Corporation has decided to do things the hard way. And now, trapped in a snare it has fashioned for itself, STII decries its inability to use the Fund in the way it sees fit—without the limits Congress attached to the operation of these funds.

That observation exposes the critical flaw in the Appellants' argument. This case does not present a choice between "unfettered political speech and subjection to

discriminatory fundraising limitations." *Davis v. FEC*, 554 U.S. 724, 739 (2008); *cf. Buckley*, 424 U.S. at 57 n.65. STII's decision to form the more cumbersome segregated fund was purely voluntary; the statutory scheme did not compel the Corporation to form the segregated fund, lest it be without a vehicle for political speech in the form of independent expenditures. The Corporation even acknowledged the tradeoff; in its advisory opinion request to the Commission, STII noted the "distinction between Connected and Non-Connected PACs," and "the trade-off between the subsidized administrative and operating costs . . . and the corresponding restriction on fundraising." J.A. at 33. By clothing itself in the letter of *Citizens United*, the Corporation claims there is a constitutional right to do things the hard way. We cannot sanction such an illogical conclusion.

As the Appellants observe, the Court did make it clear the First Amendment prohibits the silencing of an entire class of speakers, i.e., corporations, *see Citizens United*, 558 U.S. at 341–42, because they were "disfavored associations of citizens," *id.* at 356. In conjunction with this observation, the Appellants also cite our pre-*Citizens United* decision in *EMILY's List v. FEC*, 581 F.3d 1 (D.C. Cir. 2009), where we held "hybrid" political action committees are entitled to unlimited expenditure accounts. According to the Appellants' legal arithmetic, *Citizens United* "eliminated distinctions between" various organizational forms; ergo, it should have access to the same type of unlimited expenditure account sought in *EMILY's List*, notwithstanding the fact that the Fund is not a "hybrid" political action committee. *See* Appellants' Br. at 21.

But it would be disingenuous to say the Corporation is simply seeking equalization across different types of organizations. The type of account EMILY's List sought in

that case also came with strings: disclosure requirements, the sort the Appellants are endeavoring to avoid. *Cf. EMILY's List*, 581 F.3d at 19 n.16 ("This case does not involve reporting and disclosure obligations."). What the Appellants are looking for, no political action committee has.

Solicitation restrictions are difficult to categorize, as they do not fit neatly into the *Buckley* framework. But *Citizens United* aside, we have other reasons for concluding the restrictions here are not properly treated as constraints on independent expenditures. For one, they "do[] not restrict the amount or manner in which . . . [a political entity] can *spend* money." *Siefert v. Alexander*, 608 F.3d 974, 988 (7th Cir. 2010) (emphasis added). Nor can we say the restriction truly silences the segregated fund as the speaker—instead, it serves to "limit contributions . . . from certain persons or groups," i.e., non-employees, in exchange for administrative ease. *Wolfson v. Concannon*, 750 F.3d 1145, 1153 (9th Cir. 2014) (emphasis omitted). Though STII suggests the First Amendment allows the unfettered ability to solicit, "[n]either the right to associate nor the right to participate in political events is absolute. Nor are the management, financing, and conduct of political campaigns wholly free from governmental regulation." *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 567 (1973) (citations omitted); *see id.* at 567 n.13 (citing, *inter alia*, a ban on the solicitation of political contributions). Though we cannot speak to solicitation restrictions generally, this idiosyncratic and outmoded congressional arrangement is not deserving of the closest sort of scrutiny.

B

What *Citizens United* does do, however, is highlight the oddity of the segregated funds' existence in the wake of that

case. STII insists we treat the Fund as if it existed in isolation, with a distinct set of constitutional protections attendant to it. But it is unclear whether our analysis should be so formalistic. *Cf. Burwell v. Hobby Lobby Stores, Inc.*, --- S. Ct. ----, 2014 WL 2921709, at *13 (U.S. June 30, 2014). After all, the Corporation begot the Fund, the Corporation runs the Fund, and there is a great deal of—if not complete— overlap between the political speech of the Corporation and that of the Fund. *See Nat'l Right to Work Comm.*, 459 U.S. at 200 n.4 ("The separate segregated fund may be completely controlled by the sponsoring corporation or union, whose officers may decide which political candidates' contributions to the fund will be spent to assist."). If the Corporation and the Fund are two parts of the same whole, neither likely has a First Amendment claim; if the Fund is unable to speak on an issue or candidate of concern, the Corporation can, making any burden "merely theoretical," rather than substantial. *See Buckley*, 424 U.S. at 19. And that would extinguish any First Amendment claim. *See Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 418 (6th Cir. 2014) (describing the nature of the "burden imposed on core First Amendment activity" as "largely theoretical and speculative").

But let us assume STII is right in stating the Fund should be assessed in isolation. We must discern whether the Government has demonstrated "a sufficiently important interest" and "employ[ed] means closely drawn to avoid unnecessary abridgement of associational freedoms." *Buckley*, 424 U.S. at 25. STII is resolute in asserting there can be no governmental interest other than preventing *quid pro quo* corruption, which it claims is not present here. *See* Reply Br. at 8; *see also EMILY's List*, 581 F.3d at 6 ("[T]he Court has recognized a strong governmental interest in combating corruption and the appearance thereof. This, indeed, is the only interest the Court thus far has recognized

as justifying campaign finance regulation." (citations omitted)).

The Commission does not necessarily dispute the first half of that observation; instead, its position reflects an anticorruption interest more robust than the anemic one portrayed by the Appellants. *See McCutcheon v. FEC*, 134 S. Ct. 1434, 1459 (2014) (plurality opinion) ("Disclosure requirements are in part 'justified based on a governmental interest in "provid[ing] the electorate with information" about the sources of election-related spending.'" (quoting *Citizens United*, 558 U.S. at 367)). The evolving technological and political landscape has altered the scope of the anticorruption rationale. *See id.* at 1460 ("Today, given the Internet, disclosure offers much more robust protections against corruption. . . . Because massive quantities of information can be accessed at the click of a mouse, disclosure is effective to a degree not possible at the time *Buckley*, or even *McConnell*, was decided."). Although *McCutcheon* intimates disclosure is an obvious antidote to corruption and so appropriately included within the anticorruption rationale, the correlation is not self-evident and disclosure cannot be reflexively substituted as the Commission's *raison d'etre.* Not every intrusion into the First Amendment can be justified by hoisting the standard of disclosure. *Buckley*, 424 U.S. at 64.

As the Appellants point out, we observed in *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc), that "[a]n informational interest in 'identifying the sources of support for and opposition to' a political position or candidate is not enough to justify [a] First Amendment burden." *Id.* at 692 (citing *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 298 (1981)). But the *en banc* court, in rejecting First Amendment challenges to organizational and reporting requirements, remarked "the

public has an interest in knowing who is speaking about a candidate and who is funding that speech, no matter whether the contributions were made towards administrative expenses or independent expenditures." *Id.* at 698. The Commission clings to that interest now, claiming it is "protect[ing] the . . . First Amendment rights of the public to know the identity of those who seek to influence their vote." Appellee's Br. at 39 (citing *Citizens United*, 558 U.S. at 369–71). There may be circumstances in which disclosure requirements could facilitate intimidation and give free rein to animus in a way that impoverishes and inhibits public debate instead of protecting First Amendment concerns. *See, e.g.*, *NAACP v. Alabama*, 357 U.S. 449 (1958); *see also McConnell*, 124 S. Ct. at 735–36 (Thomas, J., concurring in the judgment). But this is no such case; STII makes no attempt to refute the legitimacy of the interest invoked here or examine how closely the restrictions on the segregated fund hew to the interest. Instead, its response is "only quid pro quo"—hardly a response at all. Therefore, we are satisfied with the Commission's explanation for maintaining the status quo. If the Fund wishes to solicit freely, it must do so in the light.

STII is already capable of sweeping solicitation. And yet, it wants a vehicle capable of soliciting without transparency. The Court has endorsed disclosure as "a particularly effective means of arming the voting public with information," *McCutcheon*, 134 S. Ct. at 1460, and the Appellants' approach would stifle the Government's ability to achieve that endeavor. Our Constitution does not compel such a result.

## III

We may never know why the Appellants wish to do things the hard way.  The Constitution, however, does not guarantee a right to be obstinate.  Try as it might, STII will get no satisfaction.  The district court's dismissal is

*Affirmed.*