# IN THE SUPREME COURT OF TEXAS

══════════════

No. 15-0320

══════════════


KING STREET PATRIOTS, CATHERINE ENGELBRECHT,
BRYAN ENGELBRECHT, AND DIANE JOSEPHS, PETITIONERS,

v.

TEXAS DEMOCRATIC PARTY; GILBERTO HINOJOSA, SUCCESSOR TO BOYD RICHIE,
IN HIS CAPACITY AS CHAIRMAN OF THE TEXAS DEMOCRATIC PARTY;
JOHN WARREN, IN HIS CAPACITY AS DEMOCRATIC NOMINEE FOR DALLAS
COUNTY CLERK; AND ANN BENNETT, IN HER CAPACITY AS THE DEMOCRATIC
NOMINEE FOR HARRIS COUNTY CLERK, RESPONDENTS

══════════════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

══════════════════════════════════════════════════════════════

**Argued February 7, 2017**

JUSTICE DEVINE, concurring.

> Freedom of speech is the great bulwark of liberty; they prosper and
> die together: And it is the terror of traitors and oppressors, and a
> barrier against them.[1]

In recognition of this truth, the First Amendment to the United States Constitution enshrines the freedom of speech in our law, U.S. CONST. amend. I, which includes the right to participate in the democratic process by contributing to political candidates, *McCutcheon v. Fed. Election*

---

[1] *Thomas Gordon, No. 15 Saturday, February 4, 1721. Of Freedom Of Speech: That The Same Is Inseparable From Publick Liberty*, *reprinted in* CATO'S LETTERS: VOLUME 1 79, 81 (Ronald Hamowy ed. 1995), *available at* http://lf-oll.s3.amazonaws.com/titles/1237/Trenchard_0226-01_EBk_v6.0.pdf.

*Comm'n*, 134 S. Ct. 1434, 1441 (2014). This right protects natural persons and corporations like the King Street Patriots. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010) ("First Amendment protection extends to corporations."). When individuals with a common goal incorporate under state law, government cannot exact as the price of incorporation those individuals' First Amendment rights. *Id.* at 351.

But that is what Texas's ban on corporate contributions does. Under Texas law, no corporation, regardless of its size or purpose, may contribute any amount of money to any candidate for public office. I concur in the Court's judgment because the Court has correctly applied *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146 (2003) and because Texas law says we must apply a Supreme Court case, even if called into doubt by later cases, until the Supreme Court itself overrules the case. *Bosse v. Okla.*, 137 S. Ct. 1, 2 (2016); *Owens Corning v. Carter*, 997 S.W.2d 560, 571 (Tex. 1999).

I write separately to emphasize two things. First, *Beaumont* does violence to the First Amendment and is inconsistent with *Citizens United* and *McCutcheon*. The Supreme Court must overrule *Beaumont* to bring its caselaw in line with the First Amendment. Second, schemes like Texas's that ban corporate contributions to political candidates violate the First Amendment.

I

Texas has banned corporations—large and small, rich and poor, for-profit and not-for-profit[2]—from contributing to political candidates. Any contribution to a candidate would

---

[2] Certain incorporated political committees are not "corporations" under the subchapter of the Election code that bars corporate contributions. "If a political committee the only principal purpose of which is accepting political contributions and making political expenditures incorporates for liability purposes only, the committee is not considered

be a "campaign contribution" or an "officeholder contribution." TEX. ELEC. CODE § 251.001(3), (4). A "campaign contribution" is a "contribution to a candidate or political committee that is offered or given with the intent that it be used in connection with a campaign for elective office or on a measure. Whether a contribution is made before, during, or after an election does not affect its status as a campaign contribution." *Id.* § 251.001(3). And an "officeholder contribution" is a "contribution to an officeholder or political committee that is offered or given with the intent that it be used to defray expenses that" are "incurred by the officeholder in performing a duty or engaging in an activity in connection with the office; and [are] . . . not reimbursable with public money." *Id.* § 251.001(4). Every campaign contribution and every officeholder contribution is a "political contribution." *Id.* § 251.001(5). But the Election Code allows corporations to make only political contributions allowed by law. *Id.* § 253.094(a). Nowhere does the Election Code authorize corporations to make political contributions to candidates—even through political committees.[3] A person who makes an unauthorized political contribution commits a felony of the third degree. *Id.* § 253.094(c). Thus, the Election Code prohibits corporations from contributing to candidates.

---

to be a corporation for purposes of this subchapter." TEX. ELEC. CODE § 253.092. This is a narrow exception. Any incorporated political committee having as one of its principal purposes making political contributions, *see id.* § 251.001(5) (defining "political contribution"), is still a corporation subject to the ban on corporate contributions.

[3] The Texas Democratic Party misrepresents the Election Code. The Party claims a corporation can donate as much as it wants to a candidate as long as it does so through a political committee. In support of this proposition, TDP cites TEX. ELEC. CODE § 253.096, which states, "A corporation or labor organization may make campaign contributions from its own property in connection with an election on a measure only to a political committee for supporting or opposing measures exclusively." Clearly, this provision excludes elections for office and is restricted to measure elections.

II

Texas's corporate-contribution ban violates the First Amendment.  The government can regulate protected political speech in certain circumstances.  *McCutcheon*, 134 S. Ct. at 1441. Courts therefore use a balancing test to determine whether restrictions on speech violate the First Amendment.  *See id.* at 1445 ("[W]e must assess the fit between the stated governmental objective and the means selected to achieve that objective.").  Applying such tests involves assessing the government's interest in limiting speech and determining whether the government's means are sufficiently tailored to the government's interest.  *Id.*  The Supreme Court has left unclear the level of scrutiny that applies to government regulation of political contributions.  In *Buckley v. Valeo*, the Court did not apply to political contributions the exacting scrutiny it applies in cases involving "core First Amendment Rights of political expression."  424 U.S. 1, 44–45 (1976).  Rather, the Court applied a lesser but "still rigorous" standard of review under which the government must demonstrate a "sufficiently important interest" to which its means must be "closely drawn."  *Id.* at 25–26.  Under the "exacting scrutiny" the Court applies in cases involving core First Amendment speech, including political expenditures, the government must demonstrate a compelling interest and that the means chosen to further that interest are the least restrictive means possible.  *McCutcheon*, 134 S. Ct. at 1444.  In other words, if the government wants to regulate political speech, it must have a good reason to do so, and it must not prevent more protected speech than necessary to achieve its goal.

The Court most recently discussed political contributions in *McCutcheon*.  There, the Court struck down the federal aggregate contribution limits.  *Id.* at 1442.  Whereas the federal base limits,

4

which are constitutional, cap the amount an individual may contribute to a single candidate, the aggregate limits capped how much an individual could donate overall during an election cycle. *Id.* The Court did not say what standard of scrutiny applied. *Id.* at 1445. Rather, it found "substantial mismatch" between the government's ends and means and therefore held the aggregate limits unconstitutional "even under the 'closely drawn' test." *Id.* at 1446.

After *Citizens United* and *McCutcheon*, only one interest justifies states' restrictions on political speech: preventing quid pro quo corruption or its appearance. *Id.* at 1450–51. Quid pro quo corruption entails contributions to candidates in exchange for political favors. *Id.* at 1451. However, "spending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to such quid pro quo corruption." *Id.* at 1450. Nor does the mere "possibility that an individual who spends large sums may garner influence over or access to elected officials or political parties." *Id.* at 1451 (internal quotations and citations omitted). Thus, restrictions on speech must be at least closely drawn to preventing contributors from donating to candidates or officeholders in exchange for political favors or the appearance of such arrangements.

*Beaumont* gives the government more leeway to restrict political speech than the First Amendment allows. In *Beaumont*, the Court upheld the federal ban on corporations contributing "in connection" with federal elections. 539 U.S. at 149. But *Beaumont* relied on government interests other than that in preventing quid pro quo corruption to uphold the ban. In addition to the quid pro quo corruption interest, *Beaumont* relied on interests in preventing corporations from distorting the political process, *id.* at 153–54, and in protecting minority shareholders, *id.* at 154. The Court relied

5

also on an interest in preventing people from circumventing valid contribution limits. *Id.* at 155. But the government can no longer use the antidistortion interest or minority-shareholder-protection interest to justify limitations on corporate political speech. *See Citizens United*, 558 U.S. at 361–63 (discrediting antidistortion and minority-shareholder-protection interests).

The antidistortion interest came from *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 658–59 (1990), which the Court overruled in *Citizens United*. 558 U.S. at 363. Under the antidistortion interest, the government could limit corporate contributions in order to prevent corporations from distorting the political process by using special state-granted privileges to amass "political war chests" and use those war chests to influence the democratic process. *Beaumont*, 539 U.S. at 153–54 (internal quotations omitted).

As *Citizens United* recognized, though, the antidistortion rationale is inconsistent with the First Amendment and has no place in our law. 558 U.S. at 363. "If the antidistortion rationale were to be accepted, however, it would permit Government to ban political speech simply because the speaker is an association that has taken on the corporate form." *Id.* at 349. But "[p]olitical speech is indispensable to decision-making in a democracy, and this is no less true because the speech comes from a corporation rather than an individual." *Id.* (internal quotations and citations omitted). Government simply cannot require people to forfeit their First Amendment rights in exchange for corporate privileges. *Id.* at 351.

As to *Austin*'s worry about corporations gaining an unfair advantage in the political marketplace by using resources amassed in the economic marketplace, the government has no interest in "equalizing the relative ability of individuals and groups to influence the outcome of

6

elections." *Id.* at 350. "The First Amendment's protections do not depend on the speaker's financial ability to engage in public discussion." *Id.* In short, the government may no longer rely on the antidistortion interest to justify banning corporate contributions.

Because *Citizens United* discredited the antidistortion rationale, *Beaumont*'s holding is no longer grounded in the law. The antidistortion interest played a key role in *Beaumont*. *See* 539 U.S. at 153–54, 158. There, the Court considered whether the government could keep nonprofit corporations lacking "vast reservoirs of capital" from making political contributions. *Id.* at 157–58 (internal quotations and citations omitted). According to the Court, nonprofits have the same special, state-granted privileges as for-profit corporations and therefore have the same ability to distort the political process. *Id.* at 158. "This potential for distortion justifie[d] [the state law's] general applicability to all corporations." *Id.* (internal quotations and citations omitted). The Court in *Beaumont* did not—and could not—rely on the interest in preventing quid pro quo corruption or its appearance to justify banning contributions by small nonprofit corporations.

III

Without the antidistortion interest, the government cannot impose a blanket ban on corporate contributions. If *Beaumont* were decided today, the government could rely only on the interest in preventing quid quo pro corruption or its appearance. But banning all corporate contributions is simply not tailored to that goal. Such a ban prevents corporations from contributing merely to support a candidate. It prevents also contributions by numerous corporations that lack sufficient resources to secure a quid pro quo and contributions small enough to avoid even the appearance of a quid pro quo arrangement.

7

Consider the difference between the federal aggregate limits struck down in *McCutcheon* and the federal base limits, which are constitutional. 134 S.Ct. at 1445 (citing *Buckley*, 424 U.S. at 29–30). The federal base limits cap the amount an individual can give to any particular candidate. *Id.* at 1442. The base limits are constitutional because, by limiting the amount of money a person can give to a candidate, they prevent candidates from receiving from individuals large sums of money that might give rise to a political quid pro quo or the appearance of a quid pro quo arrangement. *Buckley*, 424 U.S. at 29–30; *McCutcheon*, 134 S.Ct. at 1445.

Aggregate limits, however, are unconstitutional. *McCutcheon*, 134 S.Ct. at 1442. Rather than restricting the amount of money a donor can give to particular candidate, aggregate limits cap the amount a donor can donate overall. *Id.* For example, during the 2013–2014 election cycle an individual could donate only up to $48,600 to federal candidates. *Id.* The aggregate limits were not sufficiently tailored to the interest in preventing quid pro quo corruption or its appearance because limiting the total amount a donor could give during an election cycle had nothing to do with preventing a donor from securing a political favor in exchange for money from any particular candidate. *Id.* at 1452. Rather, the ban served only to prevent donors from supporting more candidates after donating the aggregate limit to a collection of other candidates. *Id.*

Preventing corporate contributions, like Texas does, also is unrelated to preventing quid pro quo corruption or its appearance. A donation does not create a risk of quid pro quo corruption just because it comes from a corporation rather than a natural person or other business association. Are we to believe a $1,000 check from a corporation somehow brings with it a greater threat of a quid pro quo arrangement than a check from a person or a partnership? I think not. As with the aggregate

contribution limits in *McCutcheon*, there is a "substantial mismatch" between Texas's corporate-contribution ban and the interest in preventing quid quo pro corruption or its appearance. *See McCutcheon*, 134 S.Ct. at 1446 ("Because we find a substantial mismatch between the Government's stated objective and the means selected to achieve it, the aggregate limits fail even under the 'closely drawn' test."). The time has come, therefore, for blanket bans on corporate contributions to end.

IV

In sum, I concur in the Court's judgment because I agree with the Court's application of a case we unfortunately must follow. That said, *Beaumont* is incorrect and cannot be reconciled with *Citizens United*, *McCutcheon*, or, most importantly, the First Amendment. Nor can Texas's blanket ban on corporate contributions.

_____

John P. Devine
Justice

**OPINION DELIVERED:** June 30, 2017