KAFKER, J. (concurring).
I write separately because the court does not adequately address the issue whether the law prohibiting corporate contributions is impermissibly underinclusive under the First Amendment for failing to prohibit contributions by other entities. In Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 665-666, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), the United States Supreme Court held that treating corporations and nonprofits differently from unions in the context of independent expenditures was constitutionally permissible. The Supreme Court has since overruled Austin, see Citizens United v. Federal Election Comm'n, 558 U.S. 310, 365, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), and it remains unclear whether, and to what extent, the reasoning relied on in Austin and other cases focusing on the aggregation of capital and its effect on politics may **451 still apply in the context of direct campaign contributions.[1] *1199 In my view, in the post- Citizens United world, the Supreme Court clearly still emphasizes the importance of preventing quid pro quo corruption or the appearance of such corruption in the context of direct contributions, see McCutcheon v. Federal Election Comm'n, 572 U.S. 185, 206-208, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) (plurality opinion), and also defers to evenhanded legislative regulation in this area. See Buckley v. Valeo, 424 U.S. 1, 31, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). A uniform ban on contributions from business corporations, nonprofits, and unions to prevent corruption or the appearance of corruption would thus appear to be constitutional under existing precedent. See Federal Election Comm'n v. Beaumont, 539 U.S. 146, 157-159, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003).
The Supreme Court has, however, rejected treating business corporations differently simply based on the substantial aggregations of wealth amassed by corporations or the advantages of the **452 corporate structure, at least in the context of independent expenditures. See Citizens United, 558 U.S. at 350-351, 130 S.Ct. 876. I assume at least some of the same reasoning would apply to contributions as well, although this is less clear. Campaign finance restrictions that stem from a desire to even the political playing field by reducing corporate power would certainly be impermissible. McCutcheon, 572 U.S. at 207, 134 S.Ct. 1434 (plurality opinion) ("it is not an acceptable governmental objective to level the playing field" [quotations and citation omitted] ). The Supreme Court also vigilantly protects against viewpoint discrimination. See Citizens United, supra at 340, 130 S.Ct. 876. Differential treatment of business corporations from other entities must then be closely drawn to the permissible State interest in preventing quid pro quo corruption and the appearance of quid pro quo corruption, rather that these impermissible State interests. Separating out legitimate concerns about corruption from the apparently illegitimate concerns discussed in Austin to justify differential treatment, however, remains difficult.
In the instant case, the Superior Court judge provided relevant context to the enactment *1200 of Massachusetts's first campaign finance law and the possible motivation behind its passage. As he explained:
"While [laws banning federal officers from requesting, giving, or receiving political contributions from other officers or employees] made it more 'difficult and risky' to 'shake down' government officials to help finance political campaigns, the laws also increased office-seekers' reliance on wealthy corporations and individuals for campaign contributions, which created its own set of problems.... During the 1904 presidential race, Republican candidate Theodore Roosevelt was accused of accepting large donations from corporations that expected special treatment if he was elected.... Although Roosevelt denied these assertions and won the election, he was mindful of the accusations and, in 1905, during his first address to Congress, he took aim at corporations, recommending a ban on all corporate contributions, to prevent 'bribery and corruption in Federal elections.' ... President Roosevelt asserted that 'both the National and the several State Legislatures' should 'forbid any officer of a corporation from using the money of the corporation in or about any election,' in order to 'effective[ly] ... stop[ ] the evils aimed at in corrupt practices acts.' ...
**453 Congress answered President Roosevelt's call in 1907 with the enactment of the Tillman Act, which banned corporations from 'mak[ing] a money contribution in connection with any election to any political office.' ...
"During the same year that Congress passed the Tillman Act, the Massachusetts Legislature enacted a state law banning certain corporations from 'pay[ing] or contribut[ing] in order to aid, promote, or prevent the nomination or election of any person to public office, or in order to aid, promote or antagonize the interests of any political party, or to influence or affect the vote on any question submitted to the voters.' ... Thereafter, in 1908, the Legislature passed 'An Act to prohibit the making of political contributions by business corporations,' which extended the ban to all 'business corporation[s] incorporated under the laws of, or doing business in this commonwealth' " (citations omitted).
Given the age of the Massachusetts statute and its apparent origins in a nationwide push against the influence of big business in politics, it is difficult to discern whether the basis for the statute's differential treatment of business corporations rests on grounds considered legitimate, illegitimate, or a combination of both. It is my sense that it reflects some of the same combination of reasons articulated in Austin. The question then becomes whether a statute singling out business corporations for a ban on direct campaign contributions for such a combination of reasons remains permissible. I ultimately concur in the judgment because it is not clear to me how much of the reasoning of Austin and other Supreme Court cases such as Beaumont and Federal Election Comm'n v. National Right to Work Comm., 459 U.S. 197, 210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) ( NRWC ), remain good law and how deferential the Supreme Court will be in the future to legislative choices regarding concerns about corruption even when they combine with disfavored considerations toward business corporations.
I believe the court's opinion does not adequately address the issue of underinclusion. The court focuses primarily on concerns about quid pro quo corruption stemming from business corporations to *1201 conclude that a ban on business corporation contributions is constitutionally permissible. Ante at 430-436, 105 N.E.3d at 1182-1188. See Beaumont, 539 U.S. at 163, 123 S.Ct. 2200. The ultimate issue, however, is not simply whether contributions by business corporations may be limited due to concerns about quid pro quo corruption or the appearance of such **454 corruption, but whether a statutory scheme that bans such contributions while simultaneously permitting contributions by other organizations, including well-endowed nonprofit corporations and unions, is closely drawn to the State's interest in preventing corruption and its appearance.
To justify treating business corporations differently from unions and well-endowed nonprofits, including single issue advocacy entities that are intensely involved in political campaigns, the court cites selective examples of corporate bribery scandals in Massachusetts. See ante at 434-435, 105 N.E.3d at 1186-1187. Most of the examples, however, involve personal payments put directly into the pockets of elected officials rather than election-related activity or campaign contributions. The court also notes that the record includes several instances of corporate campaign finance violations, but one could just as easily provide selective examples of union and nonprofit violations. Indeed, based simply on the record before us, unions and nonprofits have also sought to circumvent campaign finance laws. In 2013, a union political action committee (PAC) failed to disclose $178,000 in expenditures in violation of State disclosure requirements. In 2014, the American Federation of Teachers transferred money to a PAC through a nonprofit organization, which then made independent expenditures in the Boston mayoral race, in order to illegally disguise the source of the contributions. The same year, the Office of Campaign and Political Finance investigated another union PAC that had failed to accurately report independent expenditures and direct contributions made to candidates. Would these few examples sufficiently justify a prohibition on direct contributions by unions or nonprofits, but not business corporations? Of course not. But under the court's reasoning, a few such anecdotes appear sufficient to uphold such a statutory scheme.
The court further references a "long historical pedigree" of laws restricting the electoral participation of corporations. But the court fails to mention that laws restricting union participation in the electoral process enjoy a long-standing pedigree as well for many of the same reasons. See United States v. International Union United Auto., Aircraft & Agric. Implement Workers of Am., 352 U.S. 567, 570-584, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957) ( UAW ) (providing detailed history of Federal campaign finance laws as they apply to unions and the concerns that led to their enactment); NRWC, 459 U.S. at 208-209, 103 S.Ct. 552. But see Citizens United, 558 U.S. at 363, 130 S.Ct. 876 (characterizing UAW as providing a "flawed historical account of campaign finance laws"). Indeed, many States ban direct contributions from both corporations **455 and unions,[2] while only a handful of States ban contributions from *1202 corporations alone.[3]
Rather than focusing on selective examples of campaign finance violations, I believe it is necessary to explore the complexities of Supreme Court case law regarding differential treatment of business corporations in the context of direct contributions, something the court has not done.
The appropriate level of scrutiny for evaluating a campaign finance law turns on the "importance of the political activity at issue to effective speech or political association" (quotations and citation omitted). Beaumont, 539 U.S. at 161, 123 S.Ct. 2200. Restrictions on direct contributions "lie closer to the edges" of political speech than restrictions on independent expenditures. Id. Thus, while laws restricting independent expenditures receive strict scrutiny, laws restricting direct contributions need only be "closely drawn" to a sufficiently important government interest. See Buckley, 424 U.S. at 24-25, 96 S.Ct. 612 ; McCutcheon, 572 U.S. at 197, 134 S.Ct. 1434 (plurality opinion). Although campaign finance jurisprudence is in a "state of flux" post- Citizens United, the long-standing distinction between independent expenditures and direct contributions in this regard remains good law. See Green Party of Conn. v. Garfield, 616 F.3d 189, 199 (2d Cir. 2010) ; McCutcheon, supra at 196-199, 134 S.Ct. 1434 (plurality opinion).
When evaluating laws that restrict direct contributions, as here, courts must determine (1) whether the government has advanced a sufficiently important interest; and (2) whether the law is "closely drawn" to achieve that interest. See Buckley, 424 U.S. at 23-25, 96 S.Ct. 612 ; McCutcheon, 572 U.S. at 196-199, 134 S.Ct. 1434 (plurality opinion). A law is not closely drawn to a stated interest if it is impermissibly over or underinclusive. See, e.g., First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 793, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) ("the exclusion of Massachusetts business trusts, real estate investment trusts, labor unions, and other associations undermines the plausibility of the State's **456 purported concern for the persons who happen to be shareholders in the banks and corporations covered by [the law at issue]").
There is no doubt that the government has a sufficiently important interest in preventing corruption and the appearance of corruption and that direct contributions to political candidates implicate that important interest.[4] See *1203 McCutcheon, 572 U.S. at 206-207, 134 S.Ct. 1434 (plurality opinion); Citizens United, 558 U.S. at 356, 130 S.Ct. 876. Further, statutes that categorically or evenhandedly ban large contributions from organizations remain constitutional under existing Supreme Court precedent. See Beaumont, 539 U.S. at 163, 123 S.Ct. 2200. The difficult issue is differential treatment, when corruption, or the risk of corruption, stems from multiple sources, but only one of which is regulated. The analysis of how "closely drawn" the law is to the State's interest in preventing corruption and its appearance requires cognizance of the breadth of that interest. That interest applies to corruption by unions and nonprofits as well as business corporations.
The primary support for differential treatment of business corporations in the area of political finance appears in **457 Austin, 494 U.S. at 654, 110 S.Ct. 1391, an independent expenditure case. There, the Supreme Court was asked to consider the constitutionality of a Michigan law that prohibited nonmedia corporations from using general treasury funds for independent expenditures in State elections, but did not prohibit unions from doing so. Id. at 655, 666, 110 S.Ct. 1391. The plaintiff in Austin argued that there was no compelling interest to justify treating corporations differently from unions. See ibr.US_Case_Law.Schema.Case_Body:v1">id. at 659-660, 110 S.Ct. 1391. The Supreme Court held that the law was closely drawn to two compelling government interests, both of which have since been rejected in Citizens United.
First, the Supreme Court in Austin, 494 U.S. at 660, 110 S.Ct. 1391, articulated a government interest in addressing the "corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." The Supreme Court reasoned that unions and individuals alike lacked the "significant state-conferred advantages of the corporate structure" that enhances a corporation's ability to amass wealth. Id. at 665, 110 S.Ct. 1391. Thus, the State had a compelling interest in "counterbalanc[ing] those advantages unique to the corporate form," to which the law was narrowly tailored. Id. This rationale was rejected outright in Citizens United, 558 U.S. at 351, 130 S.Ct. 876, where it was characterized as an interest in equalizing speech among different groups, something that had already been rejected in Buckley, 424 U.S. at 48, 96 S.Ct. 612 (no compelling interest in "equalizing the relative ability of individuals and groups to influence the outcome of elections").
Austin, 494 U.S. at 665-666, 110 S.Ct. 1391, also articulated a government interest in protecting dissenting corporate shareholders from financially supporting *1204 the corporation's political activities. Unlike a corporate shareholder, a union member who disagrees with the union's political activities may remain in the organization without being forced to contribute to such activities. Id. Thus, according to the Supreme Court in Austin, 494 U.S. at 666, 110 S.Ct. 1391, "funds available for a union's political activities more accurately reflects members' support for the organization's political views than does a corporation's general treasury." The Supreme Court in Citizens United, 558 U.S. at 361-362, 130 S.Ct. 876, rejected this rationale as well, holding that "procedures of corporate democracy" (citation omitted) were the appropriate avenue for relief for dissenting shareholders, and that such a rationale would "allow the Government to ban the political speech even of media corporations," ibr.US_Case_Law.Schema.Case_Body:v1" id="p458" href="#p458" data-label="458" data-citation-index="2" class="page-label">**458id. at 361, 130 S.Ct. 876. Further, the Supreme Court determined that the appropriate remedy for any such interest would be to "consider and explore other regulatory mechanisms," not to restrict corporate speech. Id. at 362, 130 S.Ct. 876. Perhaps most importantly, the Supreme Court has also expressly stated that "[n]o matter how desirable it may seem, it is not an acceptable governmental objective to 'level the playing field,' or to 'level electoral opportunities,' or to 'equaliz[e] the financial resources of candidates' " (quotations and citation omitted). McCutcheon, 572 U.S. at 207, 134 S.Ct. 1434 (plurality opinion).
Thus, Citizens United overruled the rationales from Austin that would have most obviously supported disparate treatment among business corporations, nonprofits, and unions, at least in the context of independent expenditures.[5] The question then remains whether the Supreme Court would extrapolate this reasoning into the area of political contributions, where quid pro quo corruption and the appearance of such corruption are directly implicated and remain important concerns. See Buckley, 424 U.S. at 26-27, 96 S.Ct. 612. In determining whether such extrapolation will occur, we must also consider another set of Supreme Court cases. Although these cases involved challenges to a Federal statute that banned contributions from for-profit corporations, nonprofit corporations, and unions in a similar manner, the Supreme Court did include language focused on the specific concerns raised by corporations, including some of the same type of reasoning from Austin that was disavowed in Citizens United, at least in the context of independent expenditures.
In Beaumont, for example, a nonprofit corporation, North Carolina Right to Life, Inc., challenged the constitutionality of the Federal ban on direct contributions. In upholding the law, the Supreme Court emphasized *1205 "the 'special characteristics of the **459 corporate structure' that threaten the integrity of the political process," Beaumont, 539 U.S. at 153, 123 S.Ct. 2200, quoting NRWC, 459 U.S. at 209, 103 S.Ct. 552, and "the public interest in 'restrict[ing] the influence of political war chests funneled through the corporate form," Beaumont, supra at 154, 123 S.Ct. 2200, quoting Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 500-501, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) ( NCPAC ). In so doing, the Supreme Court connected these war chests to the objective of preventing corruption or the appearance of corruption. Beaumont was not discussed in Citizens United, thereby raising the question whether the rationales rejected in the context of independent expenditures may still be viable in the context of direct contributions when connected to concerns about corruption.
Indeed, in NRWC, another case involving direct contribution restrictions and the uniform Federal ban, the Supreme Court reiterated that " 'differing structures and purposes' of different entities 'may require different forms of regulation in order to protect the integrity of the electoral process' " from corruption. See NRWC, 459 U.S. at 210, 103 S.Ct. 552, quoting California Med. Ass'n v. Federal Election Comm'n, 453 U.S. 182, 201, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981). See also Beaumont, 539 U.S. at 154-155, 123 S.Ct. 2200 (discussing "war-chest corruption"); Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 257, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (discussing "concern over the corrosive influence of concentrated corporate wealth"); NCPAC, 470 U.S. at 500-501, 105 S.Ct. 1459 ("compelling governmental interest in preventing corruption supported the restriction of the influence of political war chests funneled through the corporate form"). The majority in Citizens United distinguished NRWC by stating that the law at issue in NRWC involved restrictions on direct contributions, "which, unlike limits on independent expenditures, have been an accepted means to prevent quid pro quo corruption." See Citizens United, 558 U.S. at 358-359, 130 S.Ct. 876.
These cases also exhibit deference to legislative judgments about how best to target corruption in the arena of direct contributions, at least when confronting evenhanded bans on contributions, Buckley, 424 U.S. at 31, 96 S.Ct. 612 ("a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions"). See NRWC, 459 U.S. at 209-210, 103 S.Ct. 552 ("The statute reflects a legislative judgment that the special characteristics of the corporate structure require particularly careful regulation" and "we accept Congress's judgment"). See also Beaumont, 539 U.S. at 155, 123 S.Ct. 2200, quoting NRWC, supra at 209-210, 103 S.Ct. 552 ("our cases on **460 campaign finance regulation represent respect for the 'legislative judgment that the special characteristics of the corporate structure require particularly careful regulation' "); Buckley, 424 U.S. at 28, 96 S.Ct. 612 ("Congress was surely entitled to conclude that disclosure was only a partial measure, and that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions"). But this statute is at least arguably not "evenhanded" as it treats business corporations differently from nonprofits and unions for the purposes of preventing corruption.
How the Supreme Court will harmonize these cases with Citizens United remains *1206 unclear. Considerations about the amassing of wealth and the corporate structure seem to be handled differently depending on the context. It may be that contributions and concerns about quid pro quo corruption, or its appearance, allow in these considerations but independent expenditures, and the speech they entail, do not. This remains to be seen.
The court, here, does not confront the complexities of differential treatment in the case law. Indeed, the court has avoided any discussion of Austin, except in two footnotes. See ante at notes 5 and 8. Upon an examination of the jurisprudence, it is far from clear whether the reasoning of Austin will allow distinctions among business corporations, nonprofits, and unions, and if so, how.
Ultimately, however, we cannot base our decision on speculation over whether the Supreme Court will extend its reasoning in Citizens United into the contribution case law and hold that singling out business corporations for differential treatment based on reasoning in Austin is impermissible. As the Supreme Court itself has stated:
"We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [other courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."
Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), quoting **461 Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Federal courts have continued to apply the existing jurisprudence on direct contribution restrictions, rather than attempting to anticipate possible changes from what the Supreme Court has said in the context of independent expenditures. See, e.g., Iowa Right to Life Comm., Inc. v. Tooker, 717 F.3d 576, 602-603 (8th Cir. 2013), cert. denied, 572 U.S. 1046, 134 S.Ct. 1787, 188 L.Ed.2d 757 (2014) (applying Austin's equal protection clause analysis to uphold law banning corporate contributions but permitting union contributions); Minnesota Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 879 (8th Cir. 2012) (applying Beaumont, as well as Austin insofar as it was not explicitly overruled in Citizens United, to review denial of preliminary injunction sought against statute that bans corporation contributions but not union contributions); Ognibene v. Parkes, 671 F.3d 174, 184 (2d Cir. 2012) ("Since the Supreme Court preserved the distinction between expenditures and contributions, there is no basis for Appellants' attempt to broaden Citizens United"). Supreme Court "decisions remain binding precedent until [that court] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." Bosse v. Oklahoma, --- U.S. ----, 137 S.Ct. 1, 2, 196 L.Ed.2d 1 (2016), quoting Hohn v. United States, 524 U.S. 236, 252-253, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998). For this reason, I concur in the judgment, as the Supreme Court has not yet extended its holding in Citizens United to restrictions on direct contributions.

Article 5 of the Massachusetts Declaration of Rights may recognize two valid principals whose interests a representative may advance: a representative's constituents and the people of the Commonwealth at large. That the Constitution may intend representatives to be agents of both is clarified by theories of representation debated at the time that the 1780 Constitution was drafted.
In the Eighteenth Century, members of the British Parliament, once elected, were generally considered not to be agents of their constituencies, but representatives of the entire nation. William Blackstone explained that "every member, though chosen by one particular district, when elected and returned serves for the whole realm. For the end of his coming thither is not particular, but general; not barely to advantage his constituents, but the common wealth" (emphasis in original). 1 W. Blackstone, Commentaries *155. Arthur Onslow, who served as the Speaker of the House of Commons from 1728-1761, explained that "every Member is equally a Representative of the whole (within which, by our particular constitution, is included a Representative, not only of those who are electors, but of all the other subjects of the Crown of Great Britain at home, and in every part of the British empire, except the Peers of Great Britain) has, as I understand, been the constant notion and language of Parliament." J. Hatsell, Precedents of Proceedings in the House of Commons 47, note (1781). This theory of Representation justified Parliament's imposition of taxes and other laws on the colonies before the American Revolution. R. Luce, Legislative Principles, The History and Theory of Lawmaking by Representative Government 438 (1930) (Luce). Under the theory, a "British subject in Massachusetts Bay or Virginia was represented in Parliament just as much as if he were living in London. The accident of voting or not voting had nothing to do with the question." Id.
Massachusetts revolutionaries, such as Otis and the Adamses, rejected this theory, id.; art. 5 expresses that rejection. Although the article certainly does not eliminate a representative's responsibilities to the entire Commonwealth of Massachusetts, I believe the Massachusetts Constitution does require representatives to balance this responsibility with a consideration of and duty to advance the best interests (and perhaps expressed needs) of his or her constituents. See art. 5. See also art. 19 of the Massachusetts Declaration of Rights (people have right to instruct representatives); Bresler, Rediscovering the Right to Instruct Legislators, 26 New Eng. L. Rev. 355, 360 (1991). Contrast arts. 5 and 19 with, for example, the French Constitution of 1795, which stated: "The members of the legislative body are not representatives of the departments which have elected them, but of the whole nation, and no specific instruction shall be given them." Luce, supra at 445.

Donors making donations of one hundred dollars or more in the period before the 1996 election made up less than one per cent of the Commonwealth's eligible voters. Bates v. Office of Campaign & Political Fin., 436 Mass. 144, 165 n.28, 763 N.E.2d 6 (2002). The corporate plaintiffs in this case, of course, cannot be considered qualified voters at all. See art. 3 of the Amendments to the Constitution of the Commonwealth, as amended (setting forth voter qualifications). See also art. 8 of the Declaration of Rights (establishing elections as primary form of representative accountability).

Take, for example, the comment of a congressman in 2017, who, in reference to a bill being considered in Congress, commented to members of the press: "My donors are basically saying, 'Get it done or don't ever call me again.' " GOP Lawmakers: Donors are pushing me to get tax reform done, The Hill (Nov. 7, 2017). See Here's one White House hopeful who wants to get big money out of politics, Reuters (April 18, 2015) (statement of Senator Lindsey Graham) ("We've got to figure out a way to fix this mess, because basically 50 people are running the whole show"); Michele Bachmann: The Newsmax Interview, Newsmax (June 26, 2011) (statement of Congresswoman Michele Bachmann) (describing "the corrupt paradigm that has become Washington, D.C., whereby votes continually are bought rather than representatives voting the will of their constituents .... That's the voice that's been missing at the table in Washington, D.C. -- the people's voice has been missing"); In Political Money Game, the Year of Big Loopholes, N.Y. Times (Dec. 26, 1996) (statement of Congressman Barney Frank) ("We are the only people in the world required by law to take large amounts of money from strangers and then act as if it has no effect on our behavior").

Cf. United States v. International Union United Auto., Aircraft and Agric. Implement Workers of Am. (UAW-CIO), 352 U.S. 567, 577-578, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957), quoting 86 Cong. Rec. 2720 (statement of U.S. Senator in support of limits on campaign contributions) ("We all know that money is the chief source of corruption. We all know that large contributions to political campaigns ... put the political party under obligation to the large contributors, who demand pay in the way of legislation").
Even assuming that voters, as principals, may consent to a representative that has a clearly disclosed conflict of interest by electing such an individual, see 1 S. Livermore, A Treatise on the Law of Principal and Agent 33 (1818) (principals responsible for "consequences of making ... [a deficient agency] appointment"), voters would need a choice in order to consent. If the nature of the problem is systemic, without regulation, voters are deprived of the ability to choose a candidate that does not have such a conflict and may typically be faced with a monopoly of choices that do not work with an eye single to their interests and the interests of the Commonwealth. See id. at 25 (without consent of principal there can be no appointment of agent; there must be "serious and free use of [the consent] power[ ]"). See also Bates, 436 Mass. at 165 n.28, 763 N.E.2d 6 (discussing frequency of uncontested elections).

"[G]overnment regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford. 'Ingratiation and access ... are not corruption.' " McCutcheon v. Federal Election Comm'n, 572 U.S. 185, 192, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) (plurality opinion), quoting Citizens United v. Federal Election Comm'n, 558 U.S. 310, 360, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). Of course, agents of corporations such as the plaintiffs may meet with policymakers to express their legitimate ideas and concerns regarding legislation. This freedom of expression helps policymakers refine and solidify what they believe is good policy. However, the principal-agency relationship set forth in art. 5 is broken not when a legislator is grateful to his supporters or because of access, but when an elected official takes actions that he otherwise would not have because he feels obligated to advance the interests of his donors in particular, not his constituents or the Commonwealth has a whole.

The court, in addressing this concurrence, attempts to minimize the issue of differential treatment. Here, however, "[t]he underinclusiveness of the statute is self-evident." First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 793, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). General Laws, c. 55, § 8, purports to target corruption and the appearance of corruption but, in application, singles out a subset of entities for regulation. Although the court attempts to dismiss the significance of such differential treatment, "[i]n the First Amendment context, fit matters." McCutcheon v. Federal Election Comm'n, 572 U.S. 185, 218, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) (plurality opinion). It is not enough for the government to advance a compelling interest -- we must still assess "the fit between the stated governmental objective and the means selected to achieve that objective." Id. at 199, 134 S.Ct. 1434. Yet, nowhere does the court explain why regulating corporations differently from other organizations is closely drawn to the State's interest in preventing corruption. The reasons provided by the majority apply equally to unions and nonprofits. As discussed, the rationales that would have most obviously supported this disparate treatment were articulated in Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 665-666, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990).
The court states that it does not bother to examine Austin for the "simple" reason that Austin has been overruled. Yet, the court conveniently fails to mention that Austin, not Federal Election Comm'n v. Beaumont, 539 U.S. 146, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003), remains the only Supreme Court case to squarely address the issue of disparate corporate treatment in the area of political finance. Looking solely at the court's opinion, one might assume that Beaumont addressed a statutory scheme mirroring to our own. It did not. Beaumont, supra at 154, 123 S.Ct. 2200, involved a direct contribution ban that applied uniformly to unions and corporations. Austin, supra, however, examined a campaign finance statute that regulated corporations differently from unions. Precisely because Austin was overruled, it is all the more important to closely examine the Supreme Court's jurisprudence to determine whether differential treatment of business corporations may still be permissible in the area of campaign contributions, or if it has been foreclosed by Citizens United v. Federal Election Comm'n, 558 U.S. 310, 365, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).